LAKE SHORE AND MICHIGAN SOUTHERN RAILWAY CO. *et al.*

*v.*

CHICAGO AND WESTERN INDIANA RAILROAD CO.

*Filed at Ottawa February 3, 1881.*

1. EMINENT DOMAIN—*no right to take property of one corporation for the same public use.* Where property has already been appropriated to public use, and is in fact in such use in the hands of one railroad corporation, it can not rightfully be taken away from such corporation, even by authority of a statute, for the purpose of subjecting it to the same public use in the hands of another corporation. To warrant the taking of property of one party already appropriated to public use, and placing it wholly or in part in the hands of another party for a public use, it is essential that the new use be a different use, and also that the change from the present use shall be for the benefit of the public. Whether the new use be different from the present one, is a judicial question, for the courts to decide; but where such new use may be, in its nature, a public benefit, whether the change will be for the benefit of the public is a political question, to be determined by the law-making power.

2. In a proceeding to condemn a part of the property of one railroad for the use of another leading from other and different points and regions of

country, the use is not the same as that of the prior road, but is rather a joint or co-operative use, to be exercised and enjoyed by both railroad companies, so as to furnish the public an additional line of travel and transportation, and may be properly granted by legislative action.

3. SAME—*power to exercise it is not conferred by the constitution, but only recognized and limited.* The right to exercise the power of taking private property for public use is one of the recognized powers of sovereignty, and is one of the attributes inherent in the State. The power to declare under what circumstances that right may be exercised, and to provide the mode of its exercise, was conferred upon the General Assembly by that clause of the constitution which vested in that body "the legislative power" of the State. By sec. 13 art. 2, that power is not granted, but is merely recognized, and its purpose is to limit and regulate the exercise of the power. Sec. 14, art. 11, recognizes the same power, but does not profess to grant it or to add to it. That section is and proposes only to be an authoritative explanation of the extent and nature of this power, and is but declaratory of the power the State would have had without it.

4. SAME—*extends over corporations.* The property of corporations, in so far as concerns the ownership thereof and the profit or gain to be made from its use, is to all intents and purposes private property, although applied to a use in which the public have an interest; and sec. 14 art. 11, of the constitution, simply places such property, the same as that of natural persons, within the power of eminent domain, as it was before any such declaration, and protects it the same as any other private property.

5. SAME—*railroad crossing another has the right to select point and manner of intersection.* Under the present legislation a railroad company is expressly authorized, in its location and construction, to cross and intersect any intervening railroads at any point on its route, and this, by necessary implication, is a legislative declaration that the subordination of premises already occupied by a railroad company to the use of another for a cross-way, is a change in the use which the public good demands; but the corporation seeking the right of way, when the parties can not agree, must select the place and manner of the proposed crossing, and the character and conditions of the use sought, and should state the same in the petition for condemnation, to afford the proper basis for ascertaining the compensation to be paid.

WRIT OF ERROR to the Superior Court of Cook county; the Hon. M. F. TULEY, Judge, presiding.

The plaintiffs in error brought this suit in the Superior Court of Cook county, by bill in chancery, against the defendant in error, seeking to enjoin the further prosecution by the

defendant of certain proceedings, pending in the county court of Cook county, to which plaintiffs in error were made parties defendant.

The bill states that plaintiffs in error are joint owners and tenants in common of certain grounds in Chicago, designated as blocks 34 and 35, of a tract described in the bill, which grounds were bought by them many years since, and that the same have ever since been in their possession, having always been used exclusively for railroad purposes; that each of plaintiffs in error is operating a line of more than 1000 miles of main track, and is doing business as a common carrier of freight and passengers; that the business of each has been carried on for over twenty years, and is very large and is now increasing, and has, within the three years next preceding, increased more than 75 per cent; that they have already constructed, and in actual operation, various lines of track over these grounds; that the whole of said premises is necessary for the use and occupation of the roads of complainants; that the tracks of the Chicago, Burlington and Quincy Railroad Company pass over these grounds, also connecting tracks for transfers from other railroads; that there are daily passing over said premises more than 3500 cars and about 400 engines, and that the business is now so great, and so constantly increasing, as to cause great delays and inconvenience to complainants; that there is now an immediate necessity for the building by complainants of other tracks over these grounds, and that they intend, at an early day, to construct the same, and complainants can not properly transact their business or do their duty to the public without the use of the whole of these premises, and further, that any interference therewith will cause great and irreparable injury to them and to the interests of the public committed to their charge as carriers; that defendant's articles of incorporation are for the construction and operation of a line of railroad, to begin at a point on the State line between

Illinois and Indiana, * * * to such terminus in the city of Chicago as may be selected by said corporation.

The bill further states, that defendant has instituted a condemnation suit in the county court of Cook county against complainants, to condemn fifty feet in width, diagonally, through and across said premises, in a north-east and south-west direction, and threatens, unless restrained, to prosecute such proceedings and to take possession of such strip of land.

It is further stated, that if the road of defendant be constructed as proposed, and operated, the business thereby conducted over these premises will be almost doubled; that such increase will so hinder and embarrass complainants in transferring freight and running trains, as to cause an injury, constantly increasing, and not susceptible of compensation by damages in a case at law, and would impair, infringe and destroy the franchises of complainants.

The bill also charges, that the construction and operation of defendant's road, as proposed, would, under the circumstances, necessarily be a nuisance of a serious and irreparable nature, in the delay of business and increased dangers to life.

The relief sought is a perpetual injunction, forbidding the condemnation proceedings and the construction of any road over the premises, and the taking possession of any part of the premises.

The answer, among other things, says, that before September, 1879, the defendant had selected and located the line for its track, from the city limits of Chicago to Fourteenth street, and that immediately thereafter the defendant company proceeded, with the knowledge of complainants, to expend a large amount of money in the purchase of lots, laying down of rails on its line thus selected in the city, and to construct, at great expense, its track thereon; and that, at the time of the filing of the bill, it had a line of road constructed in the city, and about ready for operation, from Fourteenth street to the limits of the city, continuously, excepting over the intervening property of complainants.

The answer also stated that both of complainants and their officers and agents had full knowledge of the large expenditure of the defendant, and of the construction of a large depot at Fourteenth street, which could only be reached by crossing the premises and the main tracks of complainants, and that as early as February, 1880, negotiations were begun by the defendant company with the complainants for an amicable settlement of the place and terms of crossing these premises and complainants' main tracks; that the point of location of defendant's crossing was actually selected and approved by the officers of complainants more than six weeks before the filing of the bill, and that a price was agreed upon, which defendant should pay for such right of way; that, acting upon the faith of such location being settled, the defendant, with the knowledge of complainants, had, at much expense, procured the necessary crossing frogs, at the requisite angle, ready to be laid upon the agreed strip, and had also procured from the Chicago, Burlington and Quincy Railroad Company a right of way to cross their line on said strip, and that this was done with the knowledge of complainants, and without objection by them; that afterwards complainants repudiated such agreement and refused to permit such crossing, and thereupon defendant instituted the condemnation proceedings to condemn an easement for right of way, crossing said strip as proposed. Defendant insists in its answer that the county court thereby acquired paramount and exclusive jurisdiction over such subject matter, and of the persons of both complainants.

The answer also states that complainants appeared by counsel in the county court, and that by their application the hearing of the proceedings was postponed, and that afterwards plaintiffs filed in such county court, as part of said proceedings, a cross petition, praying compensation to be assessed for property which, they alleged, would be damaged, but not taken, and that issues being formed in the county court, a jury was impanelled, and, without objection on the part of

complainants, the trial was entered upon and begun, and a part of the evidence heard, and that this bill was filed pending such trial.

Defendant denies that the premises are exempt from liability to condemnation in the manner being pursued by defendant, and denies that the prior location of plaintiffs' roads, upon the premises, prevents this defendant from locating said line across the same premises.

Defendant denies that any injury will accrue to complainants from the prosecution of such eminent domain action, and denies that this court of chancery has any jurisdiction to interfere with or exercise the eminent domain power of the State, or to grant an injunction staying the prosecution of said action.

The bill was verified by an affidavit of L. H. Clark, chief engineer of the Lake Shore and Michigan Southern Railroad Company. The answer was verified by the affidavit of John B. Brown, president of the defendant company.

A temporary injunction was allowed upon the filing of the bill. After the coming in of the answer, a motion to dissolve the injunction was made by defendant, supported by the affidavit of F. W. Huidekoper, president of the Chicago and Eastern Illinois Railroad Company, and documentary proofs. In opposition to the motion, complainants read in evidence affidavits of Jones, Fleming, Hopkins and Paine and Chase. The Superior Court of Cook county sustained the motion and dissolved the injunction, and (complainants' counsel asking the entry at once of a final decree, and defendant's counsel protesting against it,) it appearing to the court that no other relief save the injunction was sought by the bill, the court ordered the bill of complainants to be dismissed for want of equity. To reverse this decree, this writ of error is prosecuted.

Mr. C. D. Roys, Mr. T. F. Withrow, Mr. J. L. High, and Mr. G. W. Kretzinger, for the plaintiffs in error.

Messrs. LAWRENCE, CAMPBELL & LAWRENCE, and Mr. HENRY CRAWFORD, for the defendant in error.

Mr. CHIEF JUSTICE DICKEY delivered the opinion of the Court:

Counsel for plaintiffs in error, after stating the proposition, that the General Assembly of this State has no power, under our constitution, to take or to authorize the taking of private property from one owner for the mere purpose of giving it to another, and that it is only where such taking is "for public use" that the power of eminent domain can rightfully be exercised, insist that where property has already been appropriated to public use, and is, in fact, in such use in the hands of one corporation, it can not be rightfully taken (even by the authority of the statute to that effect) away from such corporation, for the purpose of subjecting it to the same public use in the hands of another corporation. This position we do not question. Where the public use in question is *the same,* such taking would undoubtedly degenerate into a taking from one for the mere purpose of giving to another, which we hold (under our institutions) is not within the domain of legislative power.

To warrant the taking of property of one party, already appropriated to a public use, and placing it wholly or in part in the hands of another party for a public use, it is essential that the new use be a different use, and also that the change from the present use to the new use shall be for the benefit of the public. Whether the new use be different from the present use, is a judicial question which courts may decide. But where the new use, in its nature, *may* be a public benefit, whether the change *will be* for the benefit of the public is a political question, to be determined by a political department of the government, and generally, if not always, by the law-making power.

The new use in the case at bar, in its nature, *may be* a public benefit, and clearly it is not the same use. By the

present use, the public has the benefit of an easement upon these premises for the passage of freight and passengers along the lines already constructed, leading to and from certain points and regions of country.

By the new use—the use sought by the condemnation proceedings in question—the public will have the benefit of an easement upon these premises for the passage of freight and passengers, along another and an additional line leading to and from certain other and different points and regions. Heretofore these premises have been subjected to the exclusive use of complainants in the movement of their trains. The new use to which it is proposed to subject these premises, is a joint use, or rather, a co-operative use, to be exercised and enjoyed by both complainants and defendant, so as to furnish to the public an additional line of travel and transportation.

It is error to assume, as counsel seem to do, that the present use and the proposed use are necessarily identical, merely because the property is now used "for railroad purposes," and the new use is also to be "for railroad purposes." One use for railroad purposes may differ essentially from another use for railroad purposes. Upon this error, alone, rests the assertion of counsel, that the thing sought is, to take the property from one for *no other purpose* than to give it to another. Were the argument of counsel sound in this regard, the State could have no power to authorize the crossing of an existing railroad by a new railroad, under any circumstances, without the consent of the company in possession of the road already constructed. This view can not be sanctioned.

It is also suggested, that private property *alone* is subject to such condemnation, and that the property in question can not properly be regarded as *private* property, and is, therefore, not the kind of property referred to in sec. 13, art. 2, of the constitution, wherein it is said, "*private* property shall not be taken or damaged for public use without just compensation. Such compensation, when not made by the State,

33—97 Ill.

shall be ascertained by a jury, as shall be prescribed by law."
It is contended, that instead of being private property,
these premises are a peculiar kind of property, or
rather, property so peculiarly conditioned, that they can
be appropriated for another public use (if at all) *only*
by legislation, under a supposed grant of power in sec. 14, in
art. 11, of the constitution.     And it is insisted, that "until
the General Assembly shall have provided," by statute, "the
necessary judicial machinery for that purpose," the supposed
authority conferred, as is said, by sec. 14, art. 11, can not be
exercised; and it is contended, that the General Assembly
has not, by any statute, declared the "public necessity" refer-
red to in that section, which is essential to the right to take
such property, and has not, "by any act, conferred upon any
court the power to hear and determine any proceedings seek-
ing to condemn the right of way over the land of a railroad
corporation."

These suggestions rest upon what seems a grave misconcep-
tion of the purpose and office of these clauses of the consti-
tution.     The right to exercise the power of taking property
for public use is one of the recognized powers of sovereignty,
and is one of the attributes inherent in the State.     The power
to declare under what circumstances that right may be exer-
cised, and to provide the mode of its exercise, was conferred
upon the General Assembly by that clause which vested in
that body "the legislative power" of the State.     That power
is not granted, but is merely recognized as one of the attri-
butes of the State, by sec. 13, of art. 2, and the purpose of
that section is to limit and regulate the exercise of the power,
and to protect private property against the unjust use of the
power (so recognized) by a provision, that such property
"shall not be taken or damaged" for such use "without just
compensation," and that such "just compensation, when not
made by the State, shall be ascertained by a jury, as shall
be prescribed by law."

Section 14, article 11, recognizes the same power, but does not profess to grant it or to add to it, but that section is, and professes only to be, an authoritative explanation of the extent and nature of this power.   Its language is: "The exercise of the power, and the right, of eminent domain, shall never be so construed or abridged as to prevent the taking, by the General Assembly, of the property and franchises of incorporated companies already organized, and subjecting them to the public necessity, the same as of individuals."   This is simply a declaration of the law as to the power of the State, as held and known before any such declaration was made.   It is simply a recognition of the truth (and the placing of it beyond cavil), that the property of corporations is, in so far as concerns the ownership thereof, and in so far as concerns the profit or gain to be made from its use—to all intents and purposes—private property, although applied to a use in which the public have an interest.   A private citizen may own a line of coaches—used by him in his business as a common carrier—and thus in public use, but such coaches are, nevertheless, private property.   So the boat of a ferry proprietor, although in use upon a public ferry, is the private property of the owner.   It has never been doubted, that the property of a railroad company is liable to taxation as private property, and liable to be taken in execution in satisfaction of the private debts of the company.   This 14th section of article 11 was inserted out of abundance of caution, and simply declares such property to be subject to the recognized power of eminent domain, and, like other private property, protected by the limitation, that private property shall not be taken without just compensation, to be ascertained by a jury, unless the same is to be made by the State.

We find no want of constitutional power in the General Assembly to provide, by law, for the condemnation of a right of way for one railroad over another owned and operated by another railroad company.

In so far as such property is to be regarded as public property, or devoted to public use, the General Assembly may consent, in behalf of the public, that the character of the use may be so changed. In so far as the private rights of the railroad company in such property are concerned, such rights, like other private property, are subject to the power of the State to condemn and take the same for the new use, upon payment of just compensation.

But it is said, that conceding all constitutional objections to the proposed exercise of the right of eminent domain in this regard were removed, there still remains the insuperable objection, that neither ways nor means have been provided by the General Assembly for the condemnation of such crossing, or the mode of determining the point, manner and compensation therefor; and it is suggested, that it is essential that some tribunal should be invested, by law, with power to fix the point and manner of crossing, and by its order to make provision as to whether such crossing shall be under, at, or above grade, and as to the matter of the construction and maintenance of the crossing—at whose expense and under whose supervision—and as to the construction and operation of signals, and as to precedence in the passing of trains, etc.; and that the public necessity for this crossing has not been established by competent authority, and that no lawful condemnation can be had until these things are done; and, as a consequence, that the law court has no jurisdiction in the matter of the proposed condemnation. This depends upon the construction of our statutes.

Before the adoption of the present constitution, the General Assembly had power to pass special laws granting to a corporation the right to lay down railroad tracks at any given place, and special laws granting to particular corporations special privileges, immunities and franchises; and had, also, power to provide for fixing, by commissioners, the amount of compensation to be paid for property taken for public use; and had, also, the authority, by special law, to declare the

existence of a public necessity essential, in any given case, to the lawful taking of private property for that particular use, although, in so doing, it might involve the granting of a special privilege to the corporation authorized to take the same.

Accordingly, before the adoption of the present constitution, it had been the policy of this State, apparent from its statutes, to permit the construction of no railroad until its terminal points had the special sanction of the General Assembly by the enactment of a special charter, or by special act, if the company were organized under the general law. The fixing of the terminal points and general route left, still, to the corporation the fixing of the particular location of its line at most places.   It was also the policy of the State to fix (in the first instance), by a tribunal of commissioners, the compensation to be paid for the right of way over property, (whether that of private citizens or of other railroad companies).   The points and manner of crossing other railroads were also determined by commissioners, although the railroad company had the choice of the place and manner of crossing the land of the private citizen.

After the adoption of our present constitution, the route and termini could no longer be specially sanctioned in each case by the General Assembly, for that would violate the constitutional prohibition against special legislation; and the proper compensation could, in such cases, no longer be ascertained by commissioners, for that is now required by the constitution to be ascertained by a jury.

The General Assembly was directed, by another clause of the constitution, to "provide, by general laws, for the organization of all corporations hereafter to be created."   In obedience to this mandate, and restrained by the limitations mentioned, the General Assembly passed our present general law for the incorporation of railroad companies, and our present general act relating to the exercise of the right of eminent domain.   The former was approved, and went into

force March 1, 1872; the latter was approved April 10, 1872, and went into force on the 1st day of the next July.

By the Railroad act of March 1, 1872, each railroad company organized under that act (as was the appellee herein) is expressly authorized (under certain express limitations, having no bearing upon this question,) to establish the terminal points of its proposed road, " the places from which and to which it is intended to construct the proposed railroad," and " to select the route" most advantageous, and " lay out its road * * * and construct the same," and to acquire real estate for right of way and other corporate purposes by purchase, and hold the same; take materials needed from lands adjacent to its route; to construct its railway over any plank road, turnpike or canal which its route might touch or intersect; and " to cross and intersect *any* other railway, before constructed, at *any* point on its route, and upon the grounds of such other railway company."

In all of the foregoing cases, other than the crossing of another railway, where the right of way or property sought could not be obtained by consent, voluntary sale or agreement, this statute provides expressly for acquiring the right to the same, "in the manner that may now or hereafter be provided by any law of eminent domain." In case the right of way for the crossing of another railway can not be obtained by consent or agreement with the owners thereof, as to " the amount of compensation to be made therefor, or the points and manner of such crossings and connections," it is provided, " the same shall be ascertained and determined in the manner prescribed by law."

The Eminent Domain act declares, that in *all cases* where the right to take private property for public use, without the owner's consent, or the right to construct any railway which may damage property not actually taken, *is conferred*, by general law, upon any corporation (and wherein the compensation to be paid can not be agreed upon by the parties interested), it shall be lawful for " the party authorized to take or damage

the property required, " to have such compensation ascertained by a jury, in court, in a mode in the act prescribed; and the court is directed to "order that the petitioner may enter upon such property and the use of the same," upon payment of the full "compensation so ascertained."

The language of this statute is general, and so made for the purpose of embracing all cases where the right to exercise the power of condemnation should be allowed by law. The language is applicable, in its terms, as fitly to a case wherein the right of way across another railway is sought, as it is to a case where the right of way across the land of the citizen is desired.

It is contended, however, that neither of these statutes prescribes the mode by which the *point* and *manner* of crossing is to be determined,—that the statute is silent on this subject, and no condemnation can lawfully be had for a railroad crossing until the place and manner of crossing are fixed by some tribunal. This, we think, is a mistaken view of the meaning of these statutes. It is certainly true that in all cases, whether for right of way over the land of the citizen, or right of way for a railroad crossing is sought, the place and manner of crossing are essential as a basis for the ascertainment of the compensation, for the proper compensation over either the land of the citizen or the railway of a corporation must, in all cases, depend, in a great degree, upon the place and manner of crossing. All this, we conceive, is provided for in the statute. The Railroad act authorizes appellee to cross or intersect any other railway, before constructed, at *any* point on its route (which it is also authorized to select), "and upon the grounds of such other railway company." And the Eminent Domain statute provides, that in condemnation proceedings the petition shall set forth, among other things, "the purpose for which said property is sought to be taken." Obviously the law is, that the railroad corporation seeking the right of way (where the parties do not agree), must select the place and manner of the proposed crossing,

and the character and conditions of the use sought,—that is, "the purpose for which said property is sought to be taken,"— and must state the same in the petition for condemnation; and on the basis thus presented the proper compensation is to be ascertained by a jury, under the direction of the court as to the law affecting the rights of the parties.

The authority expressly given such corporation, to cross and intersect intervening railroads at *any* point on its route, is, by necessary implication, a legislative declaration that the subordination of premises already occupied by a railroad, to the use of another railroad, for a crossing, is a change in the use, which the public good demands in all cases where the new company can afford to pay full compensation therefor. And, unless it be the law, that upon a failure to agree in that regard, the company thus crossing is to select the point of crossing and prescribe the manner of crossing, as a basis for the ascertainment of the proper compensation to be paid therefor, no new railroad, under our laws, can lawfully locate its road upon any route whatever involving the crossing of any intervening railroad, without the consent of the owners of such railroad. The General Assembly certainly never intended to bring about such a result. If the law be otherwise, the passage of this general railroad act was an idle ceremony.

The former statute, providing for the condemnation of land for right of way and other railroad purposes, required the petition to describe the land required to be taken, but did not require "the purpose" for which it was sought, to be stated. Gross' Statutes, 1869, p. 546; sec. 22 of act of 1849. That statute provided no tribunal to determine the points or manner of crossing the land of the private citizen. This, in such case, was held to be left to be determined (at points not named in the articles of incorporation) by the railroad company seeking condemnation. The place and manner of crossing upon the land of the citizen might be stated in the petition as a basis for fixing the compensation. But

this court decided, in *J. & S. R. R. Co.* v. *Kidder*, 21 Ill. 131, that where the petition failed to state the mode of use proposed, the railroad company ought, on the trial, to be allowed to show, by its plans and profiles, the manner of use proposed, as a basis for fixing a just compensation in such case.  The former act, in the case of a railroad crossing, required the points and manner of crossing, as well as the compensation, to be ascertained and determined by commissioners, to be appointed by the court as then provided in respect to the taking of the lands of the citizen.  In the present statute, this provision for determination by commissioners, as to points and manner of use and as to compensation, is omitted, and in its stead, it is said the same shall be ascertained and determined as prescribed by law.

Thus, it will be seen, the effect of this change of legislation is to place the matter of right of way across another railroad, and across the land or the right of way of the owners thereof, upon *precisely* the *same* basis as that upon which the right of way across the land of the citizen had stood for many years, except that under the present constitution and law, the compensation in both cases now must be fixed by a jury, and can not be fixed by commissioners.

Under the former statute, which contained no express provisions as to the fixing of the place and mode of crossing the land of the citizen, it was held that the railroad company, by necessary implication, had power to fix the same as a basis upon which the proper compensation should rest.  It seems to follow, that by a like implication, such company must perform the same duty for the same purpose, as to the place and manner of crossing another railroad, where no express provision is found on that subject in the statute.

By the passage of these two statutes, the General Assembly having authorized appellee to select its own route and to cross any intervening railroad at any point upon its route, and condemn the right of way across such premises, and having thus, in substance, declared that such condemnation

is for public use, and this being, as already suggested, a political question, which the General Assembly has the sole power to determine, the courts have no power to review this determination. The question, whether it is wise to permit such railroad company to select its own route and choose the point and manner of crossing other railroads, was also a political question for the General Assembly to determine, and that determination can not be reviewed by the courts.

Counsel for appellants denounce this power as dangerous to the rights of other corporations and to the best interests of the public. When carefully considered this is not an unbridled power. The General Assembly seem to have been convinced, that whenever it would prove profitable to any railroad company to pay full compensation for the right of way and to incur the expense of constructing and operating a railroad upon any given route between any given terminal points, such construction and operation would always prove of such public benefit that the taking of private property for such use would, in every such case, be for public use, and, therefore, in every such case, such taking might rightfully be allowed, upon payment of just compensation. And, upon much the same considerations, the General Assembly, in the exercise of their legislative discretion, seem to have determined that it would be wise to confer on such new railroad companies the same right of determining the points and manner of crossing intervening railroads, with which all railroad companies had been allowed to exercise, for at least twenty years before that time, in relation to the points and manner of crossing the intervening lands of citizens. Past experience had shown, that in condemnation of the right of way over the land of the private citizen, a regard for their own interests had usually, if not universally, prompted railroad companies to adopt, as far as practicable, that point and that manner of crossing which would be least injurious to the owner, in order that the necessary amount of compensation therefor might, in that way, be rendered less. It may well

be that the General Assembly believed that like consider-ations would afford ample protection to the owners of inter-vening railroads already constructed, against any wanton use of this power of selection of the points and manner of crossing.

It seems plain, taking these two statutes together, that the General Assembly intended to leave, not only the question of whether the taking of any given property for any given pur-pose named in the Railroad act, would be of such public use as to warrant the taking thereof, upon just compensation, without the consent of the owner, to be solved by the all per-vading laws of trade and commerce, but also to leave the question of the place and manner of such taking to be con-trolled upon the same principles.     They are both left to the determination of the railroad company seeking the same, under the limitation that full compensation therefor must first be made by such corporation.

The legislative declaration assumes that no such corpora-tion can afford to incur the necessary cost in this regard for a work that will not prove profitable, and hence not needed for public use, or to thus take for such work property not needed therefor, especially as property rights so acquired, though fully paid for, can not be made available for any other purpose without forfeiture of all title to the same. The security against a wanton and arbitrary exercise of this power, upon mere whim or caprice, and that in all cases the point and manner of taking selected will be that least injur-ious to the owner and yet suited to the public necessity, is found in the fact that such corporations will be induced by considerations of their own best interest to select, in making such crossings, that practical place and that practical mode which will be the least detrimental to the owner, because the corporation so selecting is required by law to make to the owner full compensation, and the more injurious to the owner the place selected and the mode chosen the greater will be the amount of necessary compensation to be paid.

It is assumed that no corporation formed under this act will ever do so foolish a thing as to demand, under these proceedings, from the owners of an intervening railroad, the privilege of crossing at a point and in a mode so destructive of the interests of such owners, that full compensation therefor will be so enormous that the new company could get no profit or gain by the payment thereof. The whole matter, by the action of the General Assembly, has been left to rest upon the law of commerce and trade, that money and capital will always seek and generally find the channels in which it can safely be used to the greatest profit, and upon the judgment of the General Assembly, that the greatest public good will result from allowing it to do so.

It is asserted in the bill that the use proposed in these proceedings, which appellants seek to enjoin, will injure them in a mode and degree which can not be measured or ascertained in damages. It may be difficult to attain absolute accuracy, in such matter, as to amount. That difficulty in a greater or less degree is encountered in all condemnation proceedings where property is taken for a future use. Human judgment is liable to err in all cases, and especially in judging of the future. Against this a court of chancery can not relieve. Aside from this, it is inconceivable that any injury can result to appellants not capable of compensation in money. From the very nature of the organization of the appellant corporations, they can not have any interests other than money interest. The sole object of their existence, so far as concerns the corporation, is the pecuniary gain of their respective shareholders.

We find no sufficient ground for the intervention of a court of chancery in this matter. The decree of the court below is, therefore, affirmed.

*Decree affirmed.*