CARY LIBRARY *vs.* EDWARD P. BLISS & others.

Middlesex.　January 15, 16, 1890. — May 1, 1890.

Present: DEVENS, W. ALLEN, C. ALLEN, HOLMES, & KNOWLTON, JJ.

*Public Charity — Cy Pres — Constitutional Law — Impairing Obligation of Contract — Eminent Domain — Taking of Money.*

A gift of money was offered to a town, the income to be used in purchasing books for a proposed free public library, upon the conditions that the town should establish the library, and also provide money for purchasing books; that trustees,

consisting of the selectmen, school committee, and the settled ministers of the town, should hold and invest the money, and expend the income, and manage the library, subject to the approval of the town; and that, if the library was abandoned or ceased to be kept open for the inhabitants, the gift and any unexpended income should be forfeited to the donor. The offer was accepted by the town, the library was established, and trustees so constituted assumed the management. Two other gifts were made to the library by the same donor, one in her lifetime upon terms substantially similar, and the other a bequest without particular designation. Donations to the library were also made by other persons at different times. The St. of 1888, c. 342, was afterwards passed, creating a library corporation, and purporting to authorize it, with the assent of the town, to take the funds, books, and other library property then held by the original trustees, "to be held and applied by the corporation in the same manner as if held by said trustees." One donor, the residuary legatee of the original donor, and a majority of the trustees individually, together with the town, assented to the transfer; and the corporation voted the taking, and, upon the failure of the board of trustees to make the transfer, brought a petition for a writ of mandamus to compel such transfer. *Held*, that the statute was unconstitutional and void, as impairing the obligation of a contract within the meaning of the Federal Constitution, and in authorizing the taking without necessity property already devoted to a public use for another similar use; and that the petition could not be maintained.

PETITION, filed March 2, 1889, for a writ of mandamus, brought by the Cary Library, a corporation organized under the St. of 1888, c. 342,* to compel a minority of the trustees

---

* The first five sections of this statute, entitled "An Act to incorporate the Cary Library," which was approved May 15, 1888, are as follows :

"Section 1. Alice B. Cary, William A. Tower, Carleton A. Staples, Edward G. Porter, Albert Bryant, James S. Munroe, Ellen Dana, Matthew H. Merriam, and Augustus E. Scott, their associates and successors, are made a corporation by the name of the Cary Library, for the formation and maintenance of a public library in Lexington, with all the powers and privileges, and subject to all the duties and liabilities, set forth in the general laws which now are or hereafter may be in force and applicable to such corporations.

"Section 2. Said corporation may hold real and personal estate to the amount of two hundred thousand dollars for the purposes aforesaid, in addition to books and objects of curiosity and art.

"Section 3. Said corporation shall consist of at least thirty and not more than fifty members, residents of the town of Lexington, to be elected by the corporation by ballot, together with the school committee and selectmen of said town for the time being, who shall be members *ex officiis*.

. "Section 4. The management and control of the property of said corporation, subject to its by-laws and regulations, shall be vested in a board of nine trustees, who shall be elected by said corporation from its members by ballot. At the first election three of said trustees shall be elected for one year, three for two years, and three for three years, and thereafter said trus-

of a library of the same name in the town of Lexington to deliver to the petitioner all the funds, books, and other property in their possession as such trustees.    The case was heard by *Knowlton*, J., who reported it for the consideration of the full court, in substance as follows.

In 1867 Maria Cary addressed to the selectmen of Lexington the following letter, signed by her:

"Brooklyn, N. Y., December 10, 1867.    To the Selectmen of the Town of Lexington.    Gentlemen, — Having a regard for my native place, and wishing to promote its welfare by diffusing knowledge among its inhabitants, I desire to make through you the following proposition to the town of Lexington :

"If the inhabitants of the town of Lexington, in a town meeting duly called for that purpose, will vote to establish a free public library, open under suitable regulations to all the inhabitants of the town, and will appropriate or otherwise procure the sum of one thousand dollars in books suitable for a town library, or in cash for the purchase of books, and will vote that they will after the opening of said library for use appropriate the sum of

tees shall be elected for three years, one third thereof to be elected annually, except that members *ex officiis* shall be elected only for the terms of their respective offices ; whenever a vacancy occurs in said board of trustees, said corporation shall fill the same for the unexpired term.

" Section 5.    Whenever said town of Lexington, by vote at a town meeting called for that purpose, shall have assented thereto, said corporation may take and hold for the purposes aforesaid the funds and property now held by the trustees of Cary Library now existing in said town, which they have acquired and hold under the terms of the gifts and bequests of Maria Cary, late of said Lexington, deceased, to be held and applied by the corporation in the same manner as if held by said trustees, and shall file a detailed statement of such taking with the town clerk of said Lexington within thirty days thereafter.    Any person sustaining damages by such taking may have his damages assessed by trial by jury, upon a petition to the Superior Court for the county of Middlesex brought within sixty days after the filing of said statement.    Said town of Lexington may also, by vote at a town meeting called for that purpose, transfer to said corporation all other funds now held or hereafter received by said town for the purposes of a public library, or for the present Cary Library, to be held and applied by the corporation in the same manner as if they were held by the town, and may transfer to said corporation the books and pamphlets comprising the present Cary Library, and objects of curiosity and art, and other property connected therewith, upon such terms and conditions as shall be agreed upon by said town and corporation."

forty dollars a year for the purchase or repair of books for said library for the space of six years, I will give them one thousand dollars, the interest of which shall be expended from year to year for the purchase of books to increase the said library.

"The said sum of one thousand dollars thus given shall be held by the selectmen and the school committee of the town for the time being, and the settled ministers of the place, as trustees, who shall invest the same and expend the interest accruing therefrom in their best discretion for such books as they shall deem suitable for the library, and the said trustees shall have the general supervision of said library, and shall make such rules and regulations for the management thereof as they may consider most conducive to the public interest, the said rules and regulations to be submitted to the town for their approval. And the said trustees shall report to the town annually, stating the manner in which the fund held by them is invested, the number of volumes in the library, and the general condition of the same, with such suggestions and recommendations as they may deem useful to the parties concerned.

"This offer is made upon the conditions, that if said library shall be abandoned, or shall at any time cease to be kept open to the inhabitants of the town, as above provided, the said town shall forfeit and the trustees shall make over said sum of one thousand dollars (to be given by me), together with the accrued interest which shall remain by them unexpended, to me and my heirs, executors, and administrators."

At a meeting of the inhabitants of the town of Lexington, held on April 20, 1868, which was duly called for the purpose, the town voted to establish a public library, to be called the Cary Library, and appointed the selectmen, the school committee for the time being, and the settled clergymen of the town a committee to solicit contributions for the proposed library, directing them, after they had secured a certain amount, to "apprise Mrs. Cary that the town has gratefully accepted her liberal offer, and has complied with its terms, and that they are ready to receive as trustees and to invest the sum of one thousand dollars offered by her, and to appropriate the interest of the same to the purchase of books, the town paying forty dollars annually, agreeably to and in conformity with the conditions of her gift." The town at the

same meeting also authorized and directed the selectmen to hire
a suitable place for the library, and to engage some person to
take care of it.   Subsequently, the board of trustees, constituted
as mentioned in the letter of Maria Cary of December 10, 1867,
met and organized, and, by direction of the board, the chairman
sent to her a letter in which he stated that the town had accepted
her offer, that all the conditions had been complied with, and
that the trustees were ready to receive the sum of one thousand
dollars, and to "hold the same in trust for the benefit of the
library, in conformity with the terms mentioned in your commu-
nication to the town."   Shortly afterwards Mrs. Cary caused to
be sent to the trustees the sum of one thousand dollars.   The
town thereupon appropriated one thousand dollars for the pur-
chase of books, which was expended in the purchase of two other
libraries of about twelve hundred volumes.

On April 6, 1870, Mrs. Cary gave the further sum of six thou-
sand dollars, also to be held in trust, as recited in a communica-
tion from her, "by the trustees for the time being of the Cary
Library; one thousand dollars thereof to be issued by them in
the proper and appropriate setting up and furnishing of the
library rooms, and the remaining five thousand dollars to be
added to its present permanent fund, and all safely invested;
and the income of the entire fund to be applied to the gradual
and steady increase of the library, regard being had in the
expenditure of the income, to the permanent rather than the
temporary value of the library to the citizens of Lexington.
A report of the condition of the fund, the expenditures of its
income, and the income of the library, to be annually presented
by the trustees to the town authorities for the information of the
citizens generally."   Mrs. Cary afterwards died, and by her
will gave five thousand dollars more to the Cary Library, with-
out further directions as to its disposal, no reference being made
in the will to the other amounts given by her in her lifetime in
trust for the library.   Alice B. Cary, one of the trustees of the
petitioner corporation and the adopted daughter of the testatrix,
was made the residuary legatee, and received the residue of her
estate after payment of debts and legacies.

In 1868 the trustees adopted by-laws, and since that time
have regularly held meetings on an average once a month, and

have continued to supervise the library, and to hold the funds given by Mrs. Cary and to apply the income thereof in accordance with the terms of her gifts. Since that year the town of Lexington annually has made appropriations for the support of the library, which have been paid over to the trustees, and by them expended for the purchase of books and for other library purposes. No record was kept of the specific books which were purchased by the trustees with the appropriations of the town or with the income of the Cary funds, and there are no means of distinguishing such books, all the books being indiscriminately blended together in the library. All the books acquired from the appropriations made by the town, excepting the twelve hundred volumes first bought, were purchased by the trustees. During this period the trustees have received many gifts of books, statuary, pictures, relics, money, etc., some having been given in terms to the trustees of the Cary Library, some to Cary Library, some to the library, and some to the town, the trustees to have the care thereof. The value of all the books and property from all sources is from thirty thousand to forty thousand dollars. The library has been kept open continuously, and the inhabitants of the town have always had the free use and benefit of it. The property now held by the respondents consists, among other things, of books purchased by the trustees, of certain books, pictures, relics, statuary, etc. received by them as above stated, of two promissory notes of the town of Lexington, amounting to eleven thousand dollars, bearing six per cent interest and payable to the treasurer of the trustees of Cary Library, said notes representing the principal of Maria Cary's gifts, and of a deposit in a savings bank of about fifteen hundred dollars, of which one thousand dollars was a gift by George W. Robinson for the book purchasing fund, who made no declaration as to his gift otherwise than by sending his check to the treasurer of the trustees for that sum, payable to his order.

After the passage of the statute of 1888, the petitioner was duly organized; and on September 1, 1888, the town gave its assent by a formal vote to the transfer to the petitioner of the funds, books, and other property held by the library trustees. Thereafter the petitioner voted to take the funds and other property in the hands of the trustees, and attempted to assume

VOL. 151.                    24

and exercise the authority and perform the duties devolved on it by the statute and under the vote of the town, as far as possible. Due notice of the organization of the petitioner, and of its proceedings, and of the vote of the town, was given to the trustees, including the respondents. On November 14, 1888, the petitioner filed with the town clerk of Lexington a statement of the property in the hands of the trustees, which statement specified the following: "A note of the town of Lexington, dated April 1, 1883, for six thousand dollars. A note of the town of Lexington, dated February 25, 1887, for five thousand dollars. A deposit in the Lexington Savings Bank. All other funds in the hands of the treasurer. All books, pamphlets, and objects of curiosity and art, and all other property of every kind held by said trustees which they have acquired and hold under the terms of the gifts and bequests of Maria Cary, late of Lexington, deceased."

The trustees of the library, consisting of eleven persons, one of whom was absent in Europe and took no part in the proceedings, discussed at meetings held by them the question of transferring the property to the petitioner, and the majority of those present were opposed to it, but no formal vote respecting such transfer was ever passed at any meeting of the board. Thereafter, on January 9, 1889, without the consent of the four respondents, and without their knowledge until afterwards, the remaining trustees, with the exception of the one who was absent from the country, signed a paper under seal, which, after reciting the passage of the statute and the taking of the property by the petitioner, proceeded as follows: " But some doubts have arisen as to the power of the Legislature to effect the transfer of said property without consent of said trustees: Now, therefore, we, the trustees of Cary Library, hereby assent thereto, and in consideration of one dollar to us paid by said Cary Library (corporation) do hereby grant, release, and transfer to said corporation all the money, notes, and other securities, books, pamphlets, objects of curiosity and art, and all other property now held by us as said trustees, to have and to hold the same to said corporation for the use and purposes set forth, and in the manner prescribed, in said act." The signatures to this paper were obtained from the signers separately, and the paper was

not presented to the respondents, it being well known that they would not sign it. After the signing of this paper and its delivery to the petitioner, the corporation, on February 26, 1889, gave to the respondents written notice thereof, and of the taking by it of November 14, 1888, and made written demand upon them to deliver to it all the funds and property held under the terms of the gift of Maria Cary in the hands or possession of them or either of them; to which the respondents replied in writing, that they declined to recognize such demand.

George W. Robinson, one of the donors of the library, was desirous that the respondents should transfer all the property in their hands or control to the petitioner, but there was no evidence that any other of the donors to the library had consented to such transfer.

*C. Robinson & G. A. Blaney*, for the petitioner.

*W. Gaston & F. E. Snow*, for the respondents.

KNOWLTON, J.   The foundation of the Cary Library in Lexington was a gift of a thousand dollars, made by Maria Cary in accordance with the terms of her letter of December 10, 1867. Upon compliance by the town with the condition named in the letter, her gift was to go to the inhabitants of the town, to be held by a board of trustees consisting of the selectmen and the school committee of the town for the time being, and the settled ministers of the place, who were to invest it, and expend the accruing interest in their best discretion for such books as they should deem suitable for the library, and were to have the general supervision of the library, and to make such rules and regulations for the management of it as they should consider most conducive to the public interest, such rules and regulations to be submitted to the town for approval.   Her scheme contemplated the establishment of a public library for the benefit of all the inhabitants of Lexington, supported in part by the income of a fund furnished by her, and in part by moneys supplied by the town.   It is perhaps not of much consequence in the consideration of this case, or in the practical management of the trust, whether the legal title to the fund, or to the library itself, was in the trustees or in the town.   In either case, the trustees had the management and control of the fund and of the library.   They had not a mere naked power, but a power

coupled with a trust. *Drury* v. *Natick*, 10 Allen, 169. We are of opinion that they had the legal title to the fund contributed by Mrs. Cary, and that the interest of the inhabitants was merely beneficiary. The considerations which induced the court to make a similar decision as to the legacy referred to in *Attorney General* v. *Parker*, 126 Mass. 216, apply equally to this case. There the legacy was to the town " for the benefit of all the youth of the town." It was said in the opinion, that the powers given to the trustees were inconsistent with the idea that the town was to be the owner of the legal title to the money. It is true in this case also that the rights and duties of the trustees in the management and disposition of the fund show that they have the legal title. The principal reason for holding, in *Drury* v. *Natick*, *ubi supra*, that the town took the fee in the property devised, is wanting in the case at bar. See also *Hadley* v. *Hopkins Academy*, 14 Pick. 240, 262. It seems to have been intended that the legal title to the library itself should be in the town. The letter required the town, as a condition precedent to receiving the gift, to " vote to establish a free public library," and to provide a sum of money towards the establishment and support of it. It was nowhere said that the title to the money supplied by the town, or to the books procured with it, should pass to the trustees, but it was rather implied that the library should be the property of the inhabitants, although under a trust that it should be supervised and managed by the trustees.

By another communication, on April 6, 1870, Mrs. Cary made another gift of six thousand dollars on precisely the same terms as the first, except that the trustees were directed to expend a thousand dollars of it in appropriately fitting up and furnishing the library rooms. On her death five thousand dollars more passed by her will to the Cary Library, without a particular designation of the trust. It may be doubtful, and it is immaterial, whether that sum went to the trustees as holders of the legal estate or to the town. At all events, it was to be held solely for the support and maintenance of the library, and the proceeds of it were to be used and expended under the supervision of the same trustees.

That part of the donor's scheme which relates to the man-

agement and control of the fund and of the library cannot be disregarded as unimportant. It prescribed the method of administering the charity which she thought best adapted to the accomplishment of her purpose. She chose to give her money to be used in that way. She did not authorize the use of it in any other way, unless for some reason it should become impracticable to pursue the course which she prescribed. It is fair to presume that, before founding this charity, she carefully considered the subject of its administration, and thought it wise to select for her board of trustees those public officers who have in their special charge the business interests of the town, and those whose duty it is to superintend the education of children, together with such reverend gentlemen as regularly minister in the churches, and are expected earnestly to desire the moral and religious welfare of all the people. This part of Mrs. Cary's proposal was carefully regarded by the town in all its proceedings, and was treated as an important element in the agreement which resulted from the acceptance of her offer.

The St. of 1888, c. 342, by which the plaintiff was incorporated and under which it claims title, purports to authorize the town to vote to transfer to the plaintiff all the funds and property held by the town for the purposes of a public library, or for the Cary Library then existing, and also the books, pamphlets, and other property constituting the Cary Library, and to vote to assent to a taking by the plaintiff of all the funds and property held by the trustees of the Cary Library under the terms of the gifts and bequests of Maria Cary. The town voted to make the transfer and to assent to the taking, and the plaintiff filed a statement of a taking in accordance with the provisions of the statute. The principal question now before us is whether by these proceedings the plaintiff acquired a valid title.

The statute to which we have referred undertakes materially to change the execution of the trust. It allows the town by a single act to divest itself of all property in the library, and of all connection with it, and of all right to have reports as to its condition or the investment of its funds. A transfer and taking under the statute place the library and the funds given by Maria Cary and acquired from other sources in the hands of a

corporation, which, besides the school committee and the select-
men of the town for the time being, is to consist of not less
than thirty nor more than fifty members, of whom nine are
named in the act, and the others are to be chosen by these. It
vests the management and control of the property, subject to
the by-laws of the corporation, in a board of nine trustees, to
be elected by the corporation from its members. The settled
ministers of the town are not made corporators. While the se-
lectmen and school committee are *ex officiis* members of the cor-
poration, they cannot be upon the board of trustees unless they
chance to be elected to that place by their associates. No one
of the trustees created by the acceptance of Mrs. Cary's gift is
left upon the managing board under this statute.

Without the consent of the donor, such a change in the exe-
cution of a charitable trust has never been authorized by the
courts in England when it was practicable to execute the trust
according to the original intention. In *Attorney General* v.
*Boultbee*, 2 Ves. Jr. 380, 387, it is said by the Master of the
Rolls that " the court will not decree execution of a trust of a
charity in a manner different from that intended, except so far
as they see that the intention cannot be executed literally." It
is only when it becomes impracticable to administer a charitable
trust according to its terms, that a court of chancery will apply
the doctrine of *cy pres*. *Attorney General* v. *Hartley*, 2 Jac. &
W. 353, 382. *Attorney General* v. *Earl of Mansfield*, 2 Russ.
501, 520. *Attorney General* v. *Whitchurch*, 3 Ves. Jr. 141. *At-
torney General* v. *Whiteley*, 11 Ves. 241. *Attorney General* v.
*Dedham School*, 23 Beav. 350, 357.

This subject has repeatedly been considered by this court.
In *Winthrop* v. *Attorney General*, 128 Mass. 258, the trustees
under a deed of trust, who held a large sum to be used in found-
ing and maintaining a Museum of American Archæology and
Ethnology in connection with Harvard University, sought to
make an agreement whereby the fund should be placed under
the control and management of the President and Fellows of
Harvard College, to be held as a part of their general funds,
a part of the income bearing the proportion to the whole which
this part of the fund bore to the whole fund to be paid over to
the trustees. The court said that such a departure from the

directions of the donor could be justified, if at all, only upon proof of the most pressing exigency; and that the court cannot alter the scheme of a donor, "either as to the objects of the charity or the agents by whom it is to be administered, unless it appears to be impossible to carry out the scheme according to its terms." A similar decision was made in *Harvard College* v. *Society for Theological Education*, 3 Gray, 280. In *Fellows* v. *Miner*, 119 Mass. 541, a bequest was made by a testator residing in this State to the town of Kinderhook, New York, in trust for the charitable uses declared in the will. Under the laws of the State of New York, a town could not take such a charitable bequest without express authority from the Legislature, and, an act having been passed giving the town authority to receive the bequest, it was held that the money could not be paid over, because the act authorized the appointment of the persons who were to collect and distribute the income of the fund to be made by the supervisor and justices of the peace of the town, while the will directed that they should be appointed by the town itself. See also *Baker* v. *Smith*, 13 Met. 34, 41; *Trustees of Smith Charities* v. *Northampton*, 10 Allen, 498, 501, 502; *Jackson* v. *Phillips*, 14 Allen, 539, 591, 592; *Morville* v. *Fowle*, 144 Mass. 109.

It is quite clear, that, upon grounds of mere expediency, and in the absence of an emergency requiring it, the court could not decree such a change in the administration of the trust as is contemplated by this statute; and it becomes necessary to inquire whether the principles of law which limit the authority of the court in a case of this kind are equally applicable to the action of the Legislature under our Constitution.

The acceptance by the town of Maria Cary's proposition contained in her letter created a contract, which was executed on her part by the payment of the money, and which continued binding on the town and the trustees as to their conduct in reference to the charity. Prior to the decision in *Dartmouth College* v. *Woodward*, 4 Wheat. 518, it was uncertain what construction would be given by the Supreme Court of the United States to the word "contracts" in Section 10 of Article I. of the Constitution of the United States, which provides that no State shall pass any "law impairing the obligation of contracts." It was

settled by that case that the word is to be interpreted broadly and liberally, so as to include all obligations which should be enforced and held sacred growing out of agreements, express or implied, for which there is a valuable consideration. There can be no doubt that the money of Maria Cary was paid under a contract, within the meaning of that word in this clause of the Constitution. The principles by which the courts of England and of this country have been controlled, in the decisions to which we have referred, are those rules of common right which protect men in their transactions with one another. Among them is that fundamental one which is embodied in this provision of the Constitution. If it applies to a change in the administration of a charitable trust such as has been attempted in the present case, it controls the action of the Legislature as effectually as that of the courts.

We think it does apply. The town impliedly agreed with Maria Cary to conform to the terms of her letter. The trustees also agreed that, so long as they continued to be members of the board, they would execute their trust according to her stipulations. She indicated a general purpose to devote her money to this charity, even if it should become impossible to administer it in the manner proposed, and she impliedly agreed that the court might make any reasonable modification of her scheme which might at any time become necessary. The town might become a city, and the board of selectmen or the school committee might be abolished by law, or many other things might occur which would render it impossible or impracticable literally to follow her directions. She impliedly agreed that in such a case the court or the Legislature might modify her method to adapt it to changed conditions. But she did not agree that any material change might be made unless there should be an exigency for it.

It does not appear to be necessary to depart from the plan of administration adopted by the original donor. There seems to be no practical difficulty in conforming literally to the scheme at first proposed. Under these circumstances, none of the parties can be relieved from the obligations of their contract without the consent of all the others. The statute makes no provision for obtaining the consent of any party except the town. Besides Maria Cary, many others have made gifts for the library, of

which some were given in terms to the trustees of the Cary
Library, some to Cary Library, and some to the town. It is to
be presumed that these persons knew on what trusts the library
was established and was to be managed, and that they made
their gifts to be held under the same trusts. In connection
with each of the gifts, the donor, the town, and the trustees
impliedly became parties to the same contract in regard to the
management of the library as that made with Mrs. Cary. *Had-
ley* v. *Hopkins Academy*, 14 Pick. 240, 262. *Edwards* v. *Jagers*,
19 Ind. 407, 415. So far as appears, George W. Robinson is the
only donor who has consented to a change of the contract. If
it be assumed that Alice B. Cary, the residuary legatee of
Maria Cary, has assented by petitioning for the passage of the
statute and becoming one of the corporators and a trustee, her
assent is not equivalent to the assent of the original donor.
Two of the gifts of Maria Cary were made in her lifetime, and
the contract was fully executed on her part. ' Her residuary
legatee does not legally represent her desire to secure a perma-
nent benefit to the inhabitants of Lexington. Her representa-
tive succeeds only to her rights of property. Her right to have
the trust executed in the interest of charity is a personal right,
whose value was in her enjoyment of doing good, and it is not
allied to the interest which an heir might have to avail himself
of property which belonged to his ancestor. *Sanderson* v. *White*,
18 Pick. 328, 333. *American Academy* v. *Harvard College*, 12
Gray, 582. *Attorney General* v. *Margaret and Regius Profes-
sors in Cambridge*, 1 Vern. 55. ' The possibility of a reversion
under the last clause of the letter gives the residuary legatee no
right to consent to a modification of the scheme. So far as there
is a succession to a mere right of property in the contract, her
executor and residuary legatee might represent her, although
such a representation could not inclu'̣e a right to consent to
the change proposed. But it is no' necessary to decide that
Alice B. Cary cannot give consent for Maria Cary. It is enough
that there is no one who assumes to represent the other donors,
and that their consent is not obtained.

If, in a case of this kind, either the original donor, or those
who subsequently contributed to the charity, might be suffi-
ciently represented by the trustees, the statute in the present

case makes no provision for obtaining the trustees' consent; and the paper signed by a majority of them separately, and without conference with their associates, is so inconsistent with the performance of the ordinary duties of their trust that it cannot be taken as representing a valid act of the board. *Morville* v. *Fowle*, 144 Mass. 109. We are of opinion that the statute which we are considering impairs the obligation of the contract under which this charity is administered. The principles which lie at the foundation of the *Dartmouth College case*, and of other similar decisions, are decisive of the question before us. *Louisville* v. *University of Louisville*, 15 B. Mon. (Ky.) 642. *Dartmouth College* v. *Woodward*, 4 Wheat. 518. *Allen* v. *McKeen*, 1 Sumner, 276. *New Gloucester School Fund* v. *Bradbury*, 2 Fairf. 118. *Regents of University of Maryland* v. *Williams*, 9 Gill & J. 365, 408. *Norris* v. *Abingdon Academy*, 7 Gill & J. 7. *Brown* v. *Hummel*, 6 Penn. St. 86, 96. The law laid down in these cases, that a charter establishing an eleemosynary corporation is a contract which cannot be changed by the Legislature without the consent of the parties to it, is a mere extension of the doctrine which gives a similar effect to the written statement of a scheme that is made the foundation of donations to unincorporated trustees of a public charity.

As if apprehensive that the statute, in the parts already considered, was in conflict with the Constitution, the framers of the act embodied in it a provision for taking the property under the right of eminent domain. Of this property, fifteen hundred dollars was money deposited in a savings bank; and there were two promissory notes of the town of Lexington, amounting to eleven thousand dollars, bearing interest, and payable to the treasurer of the board of trustees.

Property can be taken in this way only in the exercise of the paramount right of the government, founded on a public necessity. The question has been somewhat considered whether that necessity can ever extend to the taking of money. In *Burnett* v. *Sacramento*, 12 Cal. 76, Mr. Justice Field, now of the Supreme Court of the United States, says : " Money is not that species of property which the sovereign authority can authorize to be taken in the exercise of its right of eminent domain. That right can be exercised only with reference to other property than money,

for the property taken is to be the subject of compensation in money itself, and the general doctrine of the authorities of the present day is, that the compensation must be either made, or a fund provided for it in advance."

In Cooley on Constitutional Limitations, (4th ed.) 656, a similar opinion is expressed, and language to the same effect is found in *People* v. *Brooklyn*, 4 N. Y. 419, 424. There may be a great public exigency, as in time of war, which will authorize the government to take money in the exercise of this right. *Mitchell* v. *Harmony*, 13 How. 115, 128. *Williams* v. *Wilkerman*, 44 Misso. 484. *Yost* v. *Stout*, 4 Cold. 205. But it cannot truly be said that the taking of money by a private corporation, created to administer a public charity, is a taking of property for public use. The money taken must be paid for in money. It cannot be taken unless it is paid for in advance, or sufficient provision is made for immediate payment, which provision must be in money or in that which is deemed its equivalent. There can be no necessity for such a taking. In its nature it is not a taking for a public use. There can be a taking for a public use under this power only when, in the nature of the case, there is, or may be, a public necessity for the taking. There cannot be such a necessity in favor of a private corporation, which must provide money to pay for money. For this reason, we are of opinion that the Legislature could not authorize the taking of this property by the petitioner.

The only statement of the use to which the property is to be put is found in the provision of the St. of 1888, c. 342, § 5, that it is " to be held and applied by the corporation in the same manner as if held by said trustees." The question arises, whether taking property from one party, who holds it for a public use, by another, to hold it in the same manner for precisely the same public use, can be authorized under the Constitution. Can such a taking be founded on a public necessity? It is unlike taking for a public use property which is already devoted to a different public use. There may be a necessity for that. In the first case, the property is already appropriated to a public use as completely in every particular as it is to be. Can the taking be found to be for the purpose which must exist to give it validity? In every case it is a judicial question whether

the taking is of such a nature that it is or may be founded on a public necessity. If it is of that nature, it is for the Legislature to say whether in a particular case the necessity exists. We are of opinion that the proceeding authorized by the statute was in its nature merely a transfer of property from one party to another, and not an appropriation of property to public use, nor a taking which was, or which could be found by the Legislature to be, a matter of public necessity. *West River Bridge* v. *Dix*, 6 How. 507. *Lake Shore & Michigan Southern Railway* v. *Chicago & Western Indiana Railroad*, 97 Ill. 506. *Chicago & Northwestern Railway* v. *Chicago & Evanston Railroad*, 112 Ill. 589.

For these reasons, a majority of the court are of opinion that the St. of 1888, c. 342, is not in conformity with the Constitution of the United States. It follows, that the petitioner has no title to the property in the hands of the trustees of the Cary Library, and that the petition must be dismissed. -

*Petition dismissed.*