IN RE TRUST OF J. O. McDONOUGH, Henry Charles White and Melvin James White, trustees.

THE AMERICAN NATIONAL RED CROSS, applicant-appellant, v. HENRY CHARLES WHITE et al., trustees-appellees.

No. 50270.

(Reported in 109 N.W.2d 29)

MAY 2, 1961.

872

Bray & McCoy, of Oskaloosa, for applicant-appellant.

Garold F. Heslinga, of Oskaloosa, for appellees.

LARSON, J.—This is an appeal from a suit in equity wherein the beneficiary of a trust attempts to force the trustees to convert trust-held farm land into interest-paying securities. The trial court denied the application, holding that under the specific wording of the bequest the revenue-producing lands were to be retained, and that there was a failure to prove grounds necessary before equity would require such a sale and conversion. We agree with the trial court.

I. Equity will direct or permit the trustee of a charitable trust to deviate from a term of the trust if, owing to circumstances not known to the settlor and not anticipated by him, compliance would defeat or substantially impair the accomplishment of the purpose of the trust. In Restatement of the Law, Trusts, Second Ed., section 381, page 273, pertaining to charitable trusts, it is stated under (d): "The court will direct or permit the trustee of a charitable trust to deviate from a term of the trust if owing to circumstances not known to the settlor and not anticipated by him compliance would defeat or substantially impair the accomplishment of the purposes of the trust; and in such case, if necessary to carry out the purposes of the trust, the court may direct or permit the trustee to do acts which are not authorized or are forbidden by the terms of the trust." Also see sections 165 to 167 for like provisions for regular trusts.

Obviously, then, each case must be determined upon such principles according to its own peculiar facts. Hodge v. Wellman, 191 Iowa 877, 179 N.W. 534.

This matter being triable de novo, we ourselves must examine the evidence pertaining to the prevailing and dominant

purpose of the trust and the method of accomplishment, if any, designated by the settlor. There is no dispute that the testator's intentions, express or implied, will be carried out so far as is feasible or possible without causing destruction or substantial impairment of the evident purpose. The record here discloses the following facts.

J. O. McDonough, unmarried, died June 30, 1947, possessed of real estate of an estimated value of $92,125 and personal property of an estimated value of $105,108.94. For some fifty years he had owned and operated farm properties in Mahaska County and, as a product thereof, acquired those assets. Under his will dated April 26, 1945, defendants, Henry Charles White and Melvin James White, nephews of decedent, were appointed trustees of much of this property, the beneficial use of which was, after certain contingencies, given to the American National Red Cross, applicant herein. Our primary concern is with the seventh, ninth and tenth paragraphs of the will. They provide:

"*Seventh*: I will and devise to Henry Charles White and Melvin James White, in trust, however, the following described premises situated in Mahaska County, Iowa, to-wit: [description] upon the following trust: Said Trustees shall collect the *rents, income and profits from said real estate* and pay over the net income therefrom, annually, to my sister, Frances A. McDonough, so long as she may live, when in the sole discretion and determination of said Trustees the personal income of my said sister has ceased to be sufficient to support and maintain her in the manner in which she has been heretofore maintained; otherwise to pay said income to American National Red Cross. Upon the death of my said sister, Frances A. McDonough, then said Trustees, or the successors of them, shall continue to hold *said premises* in trust, *perpetually,* and pay the net income therefrom to American National Red Cross; said Trustees *shall continue to keep and maintain said premises and the improvements* thereon in the same condition as they are at the time of my death, and pay all taxes and assessments levied thereon before the same become delinquent, and *pay only the net income* to the said American National Red Cross; *my intention being to create a perpetual charitable trust in said land and in the in-*

*come and profits thereof,* for the benefit and use of the American National Red Cross.

"*  *  *

"*Ninth*: All the rest, residue and remainder of my property of which I may die seized or possessed, real or personal, I will, devise and bequeath absolutely and in fee simple to my said Trustees, Henry Charles White and Melvin James White, in trust, however, for American National Red Cross, *said property* to be held by them *in perpetual trust* and the *net income therefrom paid to* American National Red Cross.

"*Tenth*: In making the above disposition of my property, * * * in my opinion I can accomplish more good with the money and property that I have accumulated by leaving the bulk of it to a charitable organization * * *." (Emphasis supplied.)

The real estate described in paragraph "Seventh" of the will constituted all the real estate owned by the decedent at the time of his death. It aggregates approximately 485 acres and is designated as three farm properties, the north farm of about 125 acres, the home farm of about 200 acres, and the south farm of 160 acres. The trial court found and the evidence discloses that the north farm has exceptionally good land, a good corncrib and fences, but that the other buildings were old and of little or no value except for storage. Its present fair value was about $400 per acre.

The south farm has some rolling land with average fertility, good drainage and fences, and a fairly good house, although not modern. It has a good corncrib, a new stock shed on the west side of a poor barn, and other buildings in average to poor condition. The present fair market value of this land was $225 per acre.

The home farm is fully tillable except for a small pasture and the building site. The house is modern, the barn is good, and one corncrib is in good shape. Other buildings are average to below, but the fences are in good repair. The present fair market value of this land was established at $325 per acre.

The farms had been operated by separate tenants up until March 1, 1957. The trustees thereafter did not believe the necessary improvements on the north farm to make it rentable as

a unit were justifiable, so that land was divided and rented to the tenants on the other two farms—40 acres to Mr. M. W. Nash, tenant on the home farm, and 80 acres to Mr. James D. Coulter on the south farm. Under this arrangement each farm now has approximately 240 acres, which is nearly the average-sized farm in that locality. Although several miles lie between the tracts, the tenants are content with this arrangement which has been carried out since 1957.

It appears that each tenant is a good farm operator and producer, and each is satisfied with the situation except that Mr. Coulter would like to have his house modernized and a machine shed added to the buildings on the south farm. So far the trustees have not asked the court for permission to make these improvements.

Under the discretion granted them in paragraph "Seventh" of the will, the trustees allocated and paid to Frances A. McDonough or her estate all the net income which arose from the farm operations prior to her death on March 13, 1953, including 6400 bushels of corn and approximately 450 bushels of oats undisposed of on the date of her death.

The trial court found these returns during the nearly six years involved exceeded $38,000, or more than six per cent on the then value of the realty. It may be that the amount of the net returns was not justified during that period, but the acts of the trustees were all reported to and approved by the court after due notice to the parties in interest, including applicant herein, and there were no objections on its part at that time. The fifth annual report embodying the final report on this phase of the trust was approved on July 21, 1953.

It appears without dispute that few if any but emergency repairs to fences and buildings were made during the lifetime of Frances A. McDonough, and that the improvements were not in a good state of repair when J. O. McDonough died in 1947. As a result of that neglect, many costly repairs and several substantial capital improvements became necessary, and they have been made in the period following the death of Frances A. McDonough. This has materially reduced the net income paid to applicant over the past six years and no doubt accounts

for its dissatisfaction. On the other hand, the record establishes the fact that these repairs and improvements, long neglected, were reasonably necessary to retain good tenants and properly care for the livestock and crops. The applicant had actual knowledge of most of the improvements prior to the work, and all were made with prior or subsequent approval of the court, pursuant to due notice to applicant. It is not contended they did not add to the value of the real estate. Obviously they did. The trustees, being experienced farmers living in that locality, know the farming business both as owners and tenants and are well qualified. The applicant did not object to any expenditure until it was proposed to build a farm pond on the south farm and paint the buildings on the home place in 1959. The pond proposal was then withdrawn and the court reduced the proposed painting expenditure to $500. It has as yet not been done.

We are satisfied with the conclusion of the trial court that all capital improvements made are of a permanent nature, have materially increased the value of the real estate, and have made the farms more attractive to competent tenants. We also agree that, while the south farm should have a new barn and machine shed, and the house should be modernized, and perhaps some rebuilding could be done on the home place, no further capital improvements are now necessary and may well await a more favorable economic balance between farm costs and receipts.

Applicant's dissatisfaction with the sum received by it was voiced in the "Eleventh Annual Report" filed July 1, 1959. Applicant points out only an aggregate of $14,100 was received by it over the past six years, and argues that due to the necessary capital improvements, higher taxes, lower prices for farm products, and excessive trustee and attorney fees, the net amounted to less than one per cent per annum of the reasonable market value of the land. There is merit in its contention that if costs continue higher and receipts received for farm produce continue lower, this farm investment would seem undesirable, at least when compared with the return one could obtain from securities that are paying three to six per cent interest

per annum. However, few are convinced of this eventuality, for it appears little if any Mahaska farm land is for sale.

The record discloses considerable cash and crops held by the trustees have not been distributed, that they anticipated a payment to applicant of $6000 on July 1, 1960. After payment of $4500 to applicant pursuant to the "Eleventh" report, there remained $2584.97 plus a new deposit of $6316, and at the time of the trial below they held 7000 bushels of corn worth $7000, 3000 bushels of oats worth $1800, and 712 bushels of soybeans of the value of $1424. This would amount to approximately $19,000 undistributed prior to the twelfth report.

II. Perhaps the nub of this case is whether applicant has shown by the quantum of proof necessary that these farm lands are presently unsuitable for the purpose intended. From the record we are satisfied that the testator intended the net income from this farm land to be used for a charitable purpose via the Red Cross. The designated purpose and the Red Cross, of course, continue to exist.

The farm lands are being farmed by good tenant farmers, and the harvest of crops and products has been satisfactory. Applicant's principal complaint relates to the net distribution to it over the past six years. It argues the charitable purpose will be furthered by selling the lands and investing the receipts in interest-bearing securities which are presently bringing three, four, five, and six per cent per annum. It does not contend the lands are no longer suitable for farming or that they will not produce substantial revenue.

The question before us is not one of expediency, but of an exigency. Cary Library v. Bliss, 151 Mass. 364, 25 N.E. 92, 7 L. R. A. 765. The purpose seems clear enough and it is in no immediate danger of failure due to the lack of funds. So long as the plain intent and purpose of the testator is apparent from the terms of the will itself, that purpose, including the method, must control. Gibson v. Gibson, 280 Mo. 519, 219 S.W. 561. Although the Gibson case was not a charitable trust, the same rules apply to this phase of trust law. Restatement of the Law, Trusts, Second Ed., section 381; Murphey v. Dalton, Mo., 314 S.W.2d 726, 67 A. L. R.2d 1278, 1284. We find logic and reason

in the court's statement in the Gibson case when it said, in substance, that plaintiff asked it to set aside the testator's will and to substitute the court's judgment for the judgment of the testator.

"Experience holds up a warning finger at this point. It may well enough be that present conditions would seem to indicate the advisability of destroying the trust created in this case. Such a situation might arise [that will prove testator right and the advocates of change wrong] * * * but the indisputable fact remains that this court has neither the moral right nor the lawful power to substitute its judgment on matters of business for the judgment of testators * * *." (Page 533 of 280 Mo., page 565 of 219 S.W.)

There is much wisdom in that view as applied to the case before us. It might well happen that a war, a successful farm program, drought, or some other unexpected or unforeseen event would occur and, in "a short time, vindicate the wisdom of the testator, and emblazon the folly of the court." See 54 Am. Jur., Trusts, sections 284, 285, pages 225, 226, 227; Annotations, 168 A. L. R. 1019–1022.

Defendants contend that the period of extraordinary expense of making neglected but necessary capital improvements is over, that the other bequest has been satisfied, and that the Red Cross, as the sole beneficiary, will hereafter receive substantially larger annual returns, which will then compare favorably with the net returns from interest-bearing securities. The trial court concluded there was merit in that contention and preferred to await a more normal period before it would consider favorably any application to convert the real estate into securities. We agree with that conclusion.

III. It is true, as applicant contends and the record shows, that subsequent to the death of the testator material changes have occurred in our national economy which have adversely affected agriculture. It shows what we all know, that land values have increased, farm units are increasing in size, taxes and operating costs have risen, while the per-unit value of farm products has decreased. At the same time the per-acre and per-man hour production potentials have increased, although not

sufficient to prevent a general decrease in the return on farm investments. It is also well known and established that during this period interest paid by banks, savings and loan companies, and other funds invested in securities, has risen from one per cent to three, four, five, and even six per cent per annum. But it is also common knowledge that many of these might be reduced drastically overnight and, with the exception of some government long-time bonds, there is no certainty these securities will continue to pay such returns. The trial court recognized these facts by stating wisely that "change is the only certainty in the area of future economic conditions." This is of course a fact, for even now the government proceeds to take steps to raise the farm income and reduce the cost of borrowing money. What tomorrow brings we do not know.

True, few will disagree with the applicant that if the farmer's costs were to continue to climb, and the value of his produce were to continue to fall, even an Iowa farm would be a poor investment. We do not know how many believe that trend will continue, but it was most interesting to observe that even applicant's witnesses who testified to the present low return and high land values expressed no desire to sell their own lands and invest in securities. We cannot label the Iowa farm a poor investment unsuited for agricultural pursuits, and we do not feel the testator, who saw several such changes in the tide during his fifty years on these rich lands of Mahaska County, thought so. He knew that in the early 1930s both his land and his crops were almost valueless, and his taxes and costs far exceeded his income. In the 1940s the situation was the reverse, his taxes and costs were comparatively low and his products sold high—so high he could almost purchase another farm from the net returns over five or six years. Many did. That is the history of farm economy, and we expect it to continue.

From this well-known background, as well as from the express terms of the will, can it be denied that the testator did provide, desire, and intend that this farm land be retained by the trust and expect that the net income, which had been good over the years, would provide a generous bounty for those needing and receiving Red Cross assistance? We think not.

The trial court wisely rejected as pure speculation the contention as to what the situation might be tomorrow, ten, twenty, or fifty years hence. It recognized that some unexpected or unforeseen event might happen in a short time which would vindicate the wisdom of the testator and, by the same token, emblazon the folly of the court should it order a change under present circumstances and conditions.

■ Beneficiaries take by grace of the testator and not as a matter of right. Beneficiaries' judgment may be and sometimes is tempered with greed. This trust, of course, is a charitable trust and, as such, requires extreme care by the court. We are not persuaded to depart from the plain intent and purpose of the testator whose wisdom has been vindicated by his success in building this fortune now estimated at approximately $200,000, an increase of almost $50,000 in land valuation since his death. Dissatisfaction by the beneficiary with its return alone is not grounds for such a change.

Furthermore, we are not convinced that the trend to larger farms is a circumstance not foreseen by the testator, or that it will reduce eventually the value of farm lands. On the contrary, it may well do the opposite, for when there are no lands for sale, the sums necessary to obtain them usually remain exceedingly high.

It must be concluded that the pervading and dominant purpose of testator was to contribute the net income from his real estate and personal property, after certain bequests, to a charitable cause. He did not create this charitable cause, nor did he fix any amount or attach any condition to its charitable use. The American National Red Cross, his designated charity, has not and of course will not fail, and so we are not faced here with a situation requiring a transfer of a trust such as that in Hodge v. Wellman, supra, 191 Iowa 877, 179 N.W. 534, Lupton v. Leander Clark College, 194 Iowa 1008, 187 N.W. 496, and Mary Franklin Home v. Edson, 193 Iowa 567, 187 N.W. 546, cited by applicant. Thus, while his dominant purpose was to promote charity, it is equally clear he desired it done by the use of the net income from the real estate set out and from any revenue derived from the rest of his property, real or personal,

in paragraph "Ninth". We are not convinced that his purpose will not be better performed by following his method than by departing from it as prayed.

■ ■ IV. Generally speaking, courts of all jurisdictions search for the dominant purpose of the trust and attempt to carry it out. When a particular method of working out the trust is set out, it also will be followed unless it satisfactorily appears that by doing so the purpose of the trust would be defeated or substantially impaired. However, equity will find donor's intent as to method not exclusive irrespective of future conditions. Hodge v. Wellman, supra, 191 Iowa 877, 179 N.W. 534; Restatement of the Law, Trusts, Second Ed., section 381, page 273. Nevertheless, "There is no higher duty which rests upon a court than to carry out the intentions of a testator when the provision is not repugnant to settled principles of public policy and is otherwise valid." Shelton v. King, 229 U. S. 90, 101, 33 S. Ct. 686, 690, 57 L. Ed. 1086, 1090; Lovelace v. Marion Institute, 215 Ala. 271, 110 So. 381; 54 Am. Jur., Trusts, sections 306, 307, pages 242, 243. "Courts of equity have long exercised the jurisdiction to sell property devised for charitable uses, where, on account of changed conditions, the charity would fail or its usefulness would be materially impaired without a sale." Grace Church v. Ange, 161 N. C. 314, 317, 77 S.E. 239, 241. Thus where the intention, express or implied, is to retain property for charitable use, and a sale is not necessary for preservation of the trust estate, the sale will be refused. Outhet v. Follansbee, 218 Ill. App. 512. Mere expediency shown is not sufficient. Weakley v. Barrow, 137 Tenn. 224, 192 S.W. 927. Other courts have held such a sale may be authorized when "prudent", Stanley v. Colt, 72 U. S. (5 Wall.) 119, 18 L. Ed. 502; and "under proper circumstances", Ould v. Washington Hosp., 95 U. S. 303, 24 L. Ed. 450; and "in case of necessity arising from unforeseen change of circumstances", Jones v. Habersham, 107 U. S. 174, 183, 2 S. Ct. 336, 344, 27 L. Ed. 401, 405.

Applicant cites Matteson v. Creighton University, 105 Neb. 219, 179 N.W. 1009, as authority for its position. It is true the court there approved a sale of real estate and a conversion

of the proceeds in another form of investment, although the apparent intention of the testator was to use the property net income for a charitable purpose. That was a quieting title action brought by the buyer, and involved circumstances and conditions quite different from those at hand. There it appeared the real estate, a warehouse located on land which had become more valuable for other purposes, was expensive to maintain, and the return would never improve from it. Under such circumstances the court allowed the sale and investment in interest-bearing securities, although it appeared to transcend the original design of the donor. It was clear the donor did not foresee the change in beneficial use, and the court felt in that case the donor would have agreed to the change had he been alive to do so under the changed conditions. The decision appears correct, but here there is absolutely no showing that this land was better suited for another purpose or that the donor would have agreed to or consented to such a sale or conversion.

V. We conclude applicant has failed to show that the payments made to it over the past six years reflected the true net income from these farm lands, that the land was no longer suitable for the purpose intended by the donor, that other forms of investment would bring in over the years a greater safe return, or that the exchange would have been acceptable to the donor. Indeed, when present accumulations are distributed, the return may well compare with current safe and stable interest rates. We find in the regrouping of the farms no loss or danger to the farm values or the purpose of the trust.

Under the facts as they appear in this record we cannot say the business judgment of the testator-donor and his faith in Iowa agriculture as a sound revenue-producing investment have been shown faulty. We agree with the trial court that this sale should not be ordered under present existing conditions.—Affirmed.

All JUSTICES concur.