FRANCIS I. AMORY & others, trustees, *vs.* ATTORNEY
GENERAL & others.

Norfolk.     January 21, 1901. — May 23, 1901.

Present: HOLMES, C. J., KNOWLTON, MORTON, BARKER, & LORING, JJ.

*Devise*, Construction, Charitable trust, Administration *cy pres*, Limitation of power of sale.

A testatrix, having by her will directed that all her real estate, consisting of an es-
tate called Seven Oaks, should be devoted to a certain charitable use, and that
the trustees should have no power to sell any part of Seven Oaks, made in a
codicil the following provision: "I hereby cancel everything in my said will,
which limits the charitable uses to which my real estate and other property in
B. shall be put by the beneficiaries therein named and described; and I now
direct that said beneficiaries may use such estate and the income of the trust
fund, for all and any such purposes as shall be approved and sanctioned by the
trustees holding for them," and authorized the trustees to lease or sell any por-
tion of the real estate with the assent of the beneficiaries and to use the proceeds
"for improvements or other needs of same charity."  *Held*, that the above di-
rections in the codicil did not mean that the fund might be used for any purpose,
whether charitable or not, which the trustees might approve, but only that it
might be used for such charitable uses as they approved, the words "any such
purposes" referring back to the words "charitable uses."

A testatrix left an estate called Seven Oaks to the Sisters of St. Margaret, a Prot-
estant Episcopal charitable and religious society, to be used for the maintenance
of a temporary home for poor and invalid women, only so long as these sisters
should choose to occupy and use it for these or similar purposes, or on the ter-
mination of such use then to any similar religious or charitable association of
sisters of the Protestant Episcopal faith in the United States that will use and
occupy the estate for the above named charitable purposes, and, if none such be
found, then to the Massachusetts General Hospital for the above named or similar
charitable purposes.  The Sisters of St. Margaret, other associations of sisters
and the Massachusetts General Hospital successively declined to accept the es-
tate for the purposes named in the will.   Other charitable and religious corpo-
rations, not associations of sisters or of the Protestant Episcopal church offered
to accept the property and administer the trust under the terms of the will.  Seven
Oaks was upon the seashore, and the establishment of a seashore home was a
prominent feature of the plan of the testatrix.   If Seven Oaks could be sold and
about a third of the proceeds invested in a house and lot at the seashore, the
Sisters of St. Margaret were willing to put one of the sisters in charge of such
house and to use the income of the remainder of the proceeds in carrying out
the wishes of the testatrix so far as they could with this and such other funds as
they could obtain.   The Massachusetts General Hospital was willing, in case
Seven Oaks was sold, to accept the proceeds for the purpose of applying the in-
come in the maintenance of its Convalescent Home at Waverly, where men as
well as women are admitted.   Upon a bill filed by the trustees under the will for

instructions, it was *held*, that there was a good gift to charity, that it had not failed, and that a sale was necessary, and the following scheme reported by a master was approved by the court, namely, that Seven Oaks be sold and the trustees invest the proceeds and pay the net income therefrom to the Sisters of St. Margaret to be by them devoted to their general charitable work; *provided*, that the trustees may invest not more than a certain sum named, in the purchase of a house and land on or near the seashore, and hold it for the sisters, whenever the trustees are satisfied, that, with the aid of the income of the remainder of the fund and such other resources as the sisters may have, the sisters are able and willing to establish and maintain there a temporary home for women in accordance with the directions in the will of the testatrix. This scheme was approved by the court on the ground, that, having money to deal with instead of land, the order of preference of beneficiaries established by the will for the land should be followed in dealing with the money.

*Semble*, that a provision in a will, that the trustees thereunder shall have no power to sell any part of certain land devised for a charitable use, would not be construed as an attempt to limit the power of the court to authorize a sale, even if it is possible to limit it and thus make specific land inalienable forever. Per HOLMES, C. J.

BILL FOR INSTRUCTIONS by the trustees under the will of Jeanne Philomene Amory, late of Braintree, filed November 18, 1899.

The instructions prayed for related to the disposition of certain real estate in Braintree called Seven Oaks held by the plaintiffs for the charitable trust set forth in the will.

The case came on to be heard before *Hammond*, J., who made the following decree: " That the trust upon which the testatrix, Jeanne Philomene Amory, mentioned in the bill of complaint in this case, devised to the plaintiffs as trustees, the real estate called Seven Oaks, therein mentioned, is a valid public charitable trust; and it appearing that it is doubtful whether the objects and purposes which the testatrix intended to carry out can be attained in the mode particularly prescribed by her in her will and codicil, it is ordered that the cause be referred to Charles A. Williams, Esq., of Brookline, in said county, as master, to hear the parties and report whether such objects and purposes can be attained in the mode particularly prescribed by the testatrix; and if said objects cannot be so attained, then to report a scheme for the accomplishment of the general purpose and intent of the testatrix, having such regard to her directions as to the mode of appropriating said trust property as may be convenient with the efficacious promotion of her general design. And this case is retained for further directions."

The heirs at law of the testatrix appealed from this inter-locutory decree.

The will contained the following provisions:

"Fifth:  I give and devise my estate in Braintree aforesaid, called Seven Oaks, and used and occupied by me as a summer residence, to my husband, William Amory, junior, to have and enjoy for his life.

"Sixth:  Upon the death of my husband, the said William Amory, junior, I give and devise the said estate of Seven Oaks to Francis I. Amory, Sigourney Butler and one other to be by them chosen as is hereinafter provided, to them and to their heirs, successors and assigns, in trust, nevertheless, to hold for the following object, to wit: a Temporary Home for poor women and their young children, and for invalid women both young and old; the said Home to be under the superintendence and control of the Sisters of St. Margaret, a Protestant Episcopal charitable and religious society in Boston in said Commonwealth, and to be conducted by them in accordance with the broadest principles of Christian Charity, the poor, the sick and the weary of any christian denomination finding a temporary resting-place there; it being my express desire that no beneficiary or applicant shall be preferred to another because of any particular form of her religious belief, and furthermore, that, although this is to be a home essentially for females, yet young boys shall not be precluded from coming with their mothers.

"Seventh:  All the rest and residue of my real property I give and devise to the said Francis I. Amory, Sigourney Butler, and the one other to be by them chosen as is hereinafter provided, and their heirs, successors and assigns, in trust nevertheless, to hold, or in any manner dispose of, for the benefit of the above-mentioned Temporary Home.

"Eighth:  In the event of my surviving my husband, I give and bequeath all the rest and residue of my personal property after the payment of the legacies above-mentioned in the first, second and third clauses, to the said Francis I. Amory, Sigourney Butler and the one other to be by them chosen as is hereinafter provided, to them, their successors and assigns, in trust, nevertheless, to hold, or in any manner dispose of, for the benefit of the above-mentioned Temporary Home."

The ninth article contained provisions relating to the trustees and their powers, and provided that they should receive no compensation for their services. It concluded as follows:

"They [the trustees] shall have no power to sell any part of the above-mentioned estate known as Seven Oaks. They shall keep all the buildings thereon in good repair and well insured. They may use for improvements so much of the capital of any Fund for the benefit of said Home that may be in their control, as may be recommended by the Sisters in charge and approved by themselves.

"The said Trustees and their successors shall forever hold and manage the real and personal estate hereinbefore devoted to the purpose, under the direction and charge of the said Sisters of St. Margaret only so long as the said Sisters shall choose to occupy and use the same for these or similar purposes, and, upon the termination of such occupancy and use by the said Sisters of St. Margaret, then under the direction of any similar religious or charitable association of Sisters of the Protestant Episcopalian faith existing in the United States either as an American institution or as an American branch of an English institution that they may select, and, if there be no such association or branch that will occupy and use the said estate for the above-named charitable purposes, then all the said real and personal estate shall be conveyed by the said Trustees to the Trustees of the Massachusetts General Hospital, and their successors and assigns, for the benefit of the said Hospital, and by said Hospital to be used for the above-named or similar charitable purposes. All the foregoing provisions for the benefit of the said Home under the charge of the Sisters of St. Margaret shall apply in all respects to any institution or association that may succeed to them under the trust herein constituted."

The eleventh article was as follows: "Subject to the approval of the said Sisters, I wish and suggest that the Home may be called 'Saint Margaret's.' In giving this Home as above and in making provision for its maintenance, I do not desire to limit in any way its usefulness. I wish the Sisters to occupy it as a winter home, school or hospital, or in any way that they can make it useful; but chiefly as a summer home, so as to offer to the mothers and young children of the deserving

poor a few weeks respite from their cares and an opportunity to enjoy the bathing and the fresh air of the country and derive benefit therefrom; to young girls, a temporary home, and, if possible, instruction in their several vocations; to convalescents from the Hospital and elsewhere, rest before resuming their regular occupations; to invalids, care and nursing which in their poor homes they cannot have; to teachers, working-women and nurses for the sick, rest and change from their vocations. To all an opportunity to see and appreciate the self sacrificing lives of the Sisters, so that each may adopt a higher standard of right and duty. It is my fervent hope that many lives may be helped by the instructions of these good women and that the occupants of the Home may learn from them the reason for the faith that is in them."

A codicil to the will contained the following: "I hereby cancel everything in my said Will, which limits the charitable uses to which my Real Estate and other property in Braintree shall be put by the beneficiaries therein named and described; and I now direct that said beneficiaries may use such Estate and the Income of the Trust Fund, for all and any such purposes as shall be approved and sanctioned by the Trustees holding for them. I hereby authorize and direct said Trustees to lease or to sell any portion of said Real Estate at Braintree with the written assent and approval of the beneficiaries, as cannot be used advantageously, and to use the proceeds of said renting or sale for improvements or for other needs of same charity."

The testatrix left no real estate except Seven Oaks, and no personal property above the amount of the cash legacies and charges of administration, and no property passed to the trustees under the seventh and eighth articles of the will.

The husband of the testatrix, who survived her, relinquished his life estate in Seven Oaks.

The Sisters of St. Margaret declined to accept Seven Oaks under the terms of the will, for the reason among others that the sisterhood had no funds with which to maintain the property. The plaintiffs then offered the property successively to other sisterhoods and to the Massachusetts General Hospital, all of whom declined to accept it under the terms of the will.

The following are extracts from the master's report:

" Of the various charitable organizations which are parties, the following named offered evidence before me, namely : The Sisters of St. Margaret, the Massachusetts General Hospital, the Church Home for Orphan and Destitute Children, the Boston Florence Crittenton Home Society, and the Salvation Army. . . . I find, that the sisterhood of St. Margaret is a body of women organized under the ordinary rules of sisterhoods for benevolent purposes, nursing and taking care of the poor. It is a branch of the well known sisterhood at East Grinsted in England. The sisterhood in England is very large and does a great deal of charitable work there and in India. The society was founded in England in 1854. In this country there are about fifty professed sisters and about fifteen novices, and the principal house of the society, which is practically a hospital, is located at 17 Louisburg Square in Boston, is known as St. Margaret's Home, and the Mother Superior, Sister Louisa Mary, the head of the society in this country, resides there. . . .

" The sisters also have another hospital in Boston at No. 2 Louisburg Square, known as St. Margaret's Infirmary, and carry on St. Monica's Home for Colored Children on Joy Street in Boston ; . . . and summer homes for children and working women at Lowell Island in Salem Harbor, at Wellesley, Sea View, Humerock, New Ipswich, N. H., Cape May, and Tenallytown, D. C. . . . The three houses in Louisburg Square known as St. Margaret's Home and St. Margaret's Infirmary, and the two houses in Joy Street known as St. Monica's Home, are owned by a corporation known as the Society of St. Margaret's, organized in 1882 under Chapter 115 of the Public Statutes of this Commonwealth. This corporation consists of ·three men and about twenty members of the sisterhood. The corporation was organized for the purpose of holding any real estate that might be given for the purposes of the sisterhood. It owns but a small amount of personal property. The summer homes above mentioned are not the property of the sisterhood or of the corporation, but are owned by other charitable corporations and are managed by the sisters without any compensation. The only return which the sisters get is their board. . . . This society [the Sisters of St. Margaret] has need of a summer home for working women by the seashore, but has not sufficient funds to enable it to carry on a home at Seven Oaks.

"There was testimony on behalf of the society that if Seven Oaks could be sold, and if a part of the proceeds could be invested in the purchase by the trustees under the will of a cheaper house, and lot of land, somewhere on Cape Cod, and the remainder of the purchase money to be put at interest, and the income be paid to the sisters, they would put one of the sisters in charge, and would carry out the wishes of the testatrix so far as they could with the money thus received and such other funds as they could obtain; that they think that such a home could be procured for not exceeding $5,000; that they would expect to charge the working women for their board while they were at the home according to their ability to pay, in order to prevent the occupants of the home from feeling that they were objects of charity, and from their past experience in obtaining money from persons interested in their society, the sisters are confident that they would be able to support such a home.

"There was testimony on behalf of the Massachusetts General Hospital, and I find, that it is a corporation existing under the laws of Massachusetts, founded in 1811, and located in Boston; that it is possessed of a very large property, both of real and personal estate, devoted to the purposes of a hospital in a large degree, both for the benefit of those who can pay and for the benefit of those who cannot pay. There is attached to the hospital, and under the charge of its governors, a convalescent home located at Waverly, Mass. The hospital appropriated some years ago about thirty acres of land for the purposes of this convalescent home. Independent of the general fund of the hospital sums have been contributed to the convalescent home from time to time, which now amount to $145,620.66, the income of which goes for the benefit of the patients or occupants of the home. Under the rules of the trustees regarding the convalescent home in Waverly, it is provided: First, 'the convalescent home in Waverly shall receive patients from the general hospital.' Second, 'patients from other hospitals, hotels and private houses may be received with the consent of the resident physician of the general hospital.' Third, 'the home shall be under the general superintendence of the resident physician of the general hospital, and under the immediate management of a matron who shall be nominated annually by the resident physician and

appointed by the trustees.' There is no discrimination made in the persons received at the home if their physical condition is suitable. It may and does receive men, women and children. Poor women, young children and invalid women are cared for when the occasion arises. It is a temporary home. Upon the receipt from the trustees under the will of Mrs. Amory of information that there was possibly at the disposal of the hospital this estate of Seven Oaks in Braintree, the resident physician visited Seven Oaks, and afterwards went again with some of the trustees, and the conclusion they arrived at was that Seven Oaks was an unfit place, unfit and unhealthy for the objects in any way connected with the convalescent home; that therefore they are unwilling to take the estate of Seven Oaks as it stands. As the property now stands they could not use it, and would not wish to use it. It could only be used advantageously by them in case it could be sold. There is generally a small deficit in the annual expenses of the convalescent home. The expenses exceed the amount applicable from the income and any little receipts they may have from charges to those who are able to pay for the care they receive there, and this deficit is a charge upon and is made up from the general fund of the Massachusetts General Hospital. There is no limitation upon the amount of property which the convalescent home can hold. The hospital is willing, if Seven Oaks can be sold, and converted into money, to take the proceeds and devote the income to the purposes of the convalescent home. It would also be willing to have the trustees under the will hold the proceeds, and pay the income to the hospital to be devoted by the hospital to the purposes of the home.

" There was evidence tending to show, and I find as a fact, that the Salvation Army is a religious and charitable organization, being an American branch of an English organization, and is incorporated under the laws of New York. The army expends in charitable work in Boston annually not less than $20,000. It has in Boston a home for poor homeless women, one for working women, and one for fallen women. The members of the army, who are of both sexes, profess to be neither Protestant nor Catholic. The army is connected with no particular religious sect, and in its charitable work does not

discriminate in any way between persons of different religious denominations, or inquire as to the religious belief of those whom it assists. . . . The army is authorized to hold real estate. In the homes of the army they have religious services, but no one is required to attend them.    There was testimony on behalf of the army tending to show that it stands ready to take Seven Oaks, and to conduct a home there for women and children in accordance with the terms of Mrs. Amory's will; that it is willing to do this under an advisory board of the Protestant Episcopal Church; that no fallen women would be admitted to this home, the home which the society already has for that purpose being sufficient; that no men would be admitted.    The men relieved by the army are put on the farm colonies of the army in Ohio, California and Colorado.    That the ordinary conduct of such a home by the army would involve the allowing of women and children that might be admitted, to remain there until homes could be found for them elsewhere, and that in the ordinary administration of such a home children would be taken from the slums in the summer season from time to time, to the home grounds, for excursions, but that the army is willing so far to modify its ordinary conduct of such a home as to make the conduct of the home conform to the wishes of the testatrix as expressed in her will, as the same are understood by the army's managers.

" On behalf of the Florence Crittenton Home Society there was testimony tending to show, and I find, that this society is located in Boston, and is an outgrowth or organic part of the general system of Florence Crittenton homes throughout the United States, of which there are in all fifty-two.    A Mr. Crittenton, a very wealthy druggist of New York City, is the President of the associated Crittenton homes of the United States. Mr. Crittenton is a member of the Episcopal church in New York, and his business manager is the widow of a deceased rector of the Episcopal church.    The Boston home is a Massachusetts organization incorporated in 1896 under the general law.    It is a temporary home for women.    The other homes are organized as corporations in the respective States in which they are located.    Some of them have State aid.    All of these homes are temporary homes for destitute and friendless women.

All of these homes, including the Boston home, are supported by voluntary contributions. The Boston home has no permanent fund. The management of all these homes is local, but all of them, including the Boston home, are under the supervision of Mr. Crittenton's business manager. The Boston corporation is made up almost exclusively of ladies, they having the direct management of the home and being responsible for the finances. The matron and president of the home are both women. The home is connected with no particular religious sect, but in the board of women managers practically all the churches in Boston are represented except the Catholic church, the home being a Protestant organization. The Boston home is now located at 54 Munroe Street, in Roxbury. No distinction is ever made as to the religious belief of those who are given the benefits of the home. The ladies who manage the home are connected with it only so long as they see fit to be, being at liberty to retire at any time. At the Boston home there is a very efficient laundry which is operated by the inmates, and this laundry has paid nearly all the house expenses. . . . There was evidence on behalf of this home that the corporation would like to take the estate of Seven Oaks, and remove its present home to this spot, and would in this case conduct the home substantially on the lines of its present work, receiving poor and sick women and girls and small children with their mothers, and caring for them until they were able to care for themselves or get work elsewhere. It is the opinion of the managers of the society that the laundry could be as successfully conducted at the Seven Oaks estate as in Boston. It is the intention of this home, if it can obtain the Seven Oaks estate, to sell its present Boston home and to remove to Seven Oaks.

" On the part of the Church Home for Orphan and Destitute Children there was testimony tending to show, and I find, that this home was organized in 1855, and incorporated in Massachusetts under a special charter in 1858. The object for which the charity was organized was to provide a home and education for orphan and destitute children under the direction of the Protestant Episcopal Church. . . . The society is of the opinion that the estate of Seven Oaks is a suitable place for carrying on the

work for the purposes for which the society was started, and is willing to take this place if it shall be given to them by decree of the Court, and to run it according to the purposes named in the charter of the corporation, and the corporation has so voted. If the society were to take Seven Oaks, they would expect to sell certainly one of their present homes, and probably both. The probabilities are that they would sell both and remove to Seven Oaks. If this society were to take Seven Oaks they would necessarily be limited to the use of it for the purposes mentioned in their charter, which would preclude the admission of women.

" At the hearing before me, the counsel for the husband and heirs at law of the testatrix stated that in addition to the other questions saved by them in this cause, they wished to have a definite ruling made by me ' as to the power of the master to find for such husband and heirs at law under the terms of the decree by which the case was referred to the master.' I accordingly ruled, as matter of law, and without regard to the facts found by me or otherwise appearing in the hearing before me, that by the terms of the decree, I was not at liberty to make any finding in favor of the husband or heirs at law of the testatrix.

" I find that the testatrix left no real estate except said estate known as Seven Oaks, and no residuum of personal property remaining after the payment of the money legacies and charges of administration, so that no property of any kind, either real or personal, has ever been received by the trustees under the will of the testatrix to hold as a fund as contemplated in the seventh and eighth clauses of her said will.

" I visited the estate known as Seven Oaks, and made an examination of the property. The estate is situated in Braintree, and contains between twenty and twenty-five.acres of land. It is valued by the assessors of Braintree for the purposes of taxation at $15,300. There is a dwelling house on the land, formerly occupied by the testatrix and her husband as a summer residence, containing some fifteen or sixteen rooms. This house is in good condition, but was built for a summer house, and does not appear to have adequate heating arrangements for a winter residence. There are two other small houses on the estate, one of which was built by Mrs. Amory for the accommodation of poor children whom she had there as guests for

their recreation in the summer season. The other buildings are a cow stable, horse stable, carriage house, sheds, and a hay barn. These buildings are in a fair state of repair. The land has been carefully worked over and is laid down in grass, and there are a great many shade trees upon the estate, and a good deal of money has evidently been expended upon the estate to fit it for a residence of a person of means. The buildings are all of wood, and the expense of keeping them in repair and of keeping up the grounds would be considerable.

"I have carefully considered the provisions of the will and codicil of the testatrix, and all the evidence presented to me, and the arguments of the counsel representing the different parties, and I find and report to the Court that the objects and purposes which the testatrix intended to carry out cannot be attained in the mode particularly prescribed by the testatrix in her will and codicil, for the reason that the Sisters of St. Margaret have declined to take the estate of Seven Oaks as it stands to-day; no similar organization has been found that will take it; the Massachusetts General Hospital has declined to take it upon the trusts declared in the will; and I find it to be impracticable to divide the estate, and by renting or selling a part of it, to realize sufficient money to enable the sisters to conduct a home on the remaining land, even if they were willing to do so. To undertake thus to divide the land, and to rent or sell a part of it, in the hope of obtaining funds sufficient for the carrying on of such a home as the testatrix contemplated, on a part of the estate to be reserved for the purpose, would be a course too speculative to be countenanced, and was not suggested by any of the parties, and would not have been alluded to by me but for the suggestion in the codicil to the will.

"I may add that none of the charitable organizations which have appeared in this cause, and signified their willingness to take the estate as it now stands, appear to me to come within the class designated by the testatrix in the ninth clause of her will, to take by way of substitution in case of the failure of the Sisters of St. Margaret to take the estate or to carry on a home there, and therefore the willingness of these organizations to take the estate as it stands cannot affect my finding on this first question submitted by the decree.

"Upon the second question submitted by the decree of the Court, without going into the facts and arguments advanced by the several parties, all of which I have carefully considered, I report that upon reading the will and codicil, it seems clear that the primary object of the testatrix was to aid not necessarily absolutely destitute, but poor and invalid, working women and girls, a class not very easily reached by our ordinary public charitable organizations; and to do this through the instrumentality of the Sisters of St. Margaret (with whose aims and methods of working the testatrix must be presumed to have been familiar), or by the aid of some similar organization of the Protestant Episcopal Church; and that the moral and religious influence which the sisters were expected to exert by their example over the persons coming under their care, formed an essential part of the scheme of the testatrix.

"Undoubtedly the testatrix believed the best way to accomplish this general purpose to be the method pointed out by her, of converting the estate of Seven Oaks into a temporary resting place or home, to be under the charge of the sisters, and which they themselves to some extent could occupy.

"But circumstances having arisen which make it impossible to carry out the plan of the testatrix in its entirety, it appears to me that it would be a greater departure from the general purpose and object of the testatrix to turn over the estate to any of the charitable organizations which are parties to this suit, to be used for the relief of persons not very closely resembling the class intended by the testatrix, or to be administered by a very different class of persons, or by persons who, however much they may resemble the Sisters of St. Margaret in their methods of working, are nevertheless of a different religious sect, than would be the case if the property were to be sold, and the proceeds devoted to the general charitable purposes of the Sisters of St. Margaret. As the property must be sold and converted into money before the Massachusetts General Hospital is willing to avail itself of the gift, and the hospital would then apply the income to the general purposes of its home at Waverly, which admits persons of both sexes, and is not under the management of the sisters or any kindred society, it seems to me that the general purposes of the testatrix will not be so well met by giving the income of

the fund to be obtained from the sale of the estate to that institution as would be the case if it were to be given to the Sisters of St. Margaret for their general charitable work. At the same time, I think that the establishment of a seashore home was a prominent feature in the mind of the testatrix, and that such a home should be established if it be found to be practicable.

" I accordingly report for the consideration of the Court, the following scheme for the administration of the charity created by the testatrix, as the one which seems to me to be most in accord with the general purpose and intent of the testatrix, and as nearly consistent with her directions as to the mode of accomplishing such general purpose and intent as is possible in the circumstances which have arisen, and which make some departure from the strict letter of her directions absolutely necessary.

" Scheme : That the trustees under the will be directed to sell the estate known as Seven Oaks at public or private sale, for such price and upon such terms of payment as they in the exercise of their discretion may deem best, and to convey the same to the purchaser in fee simple, free and clear of all trusts, and without any obligation on the part of the purchaser to see to the application of the purchase money. That the proceeds of such sale, less the cost of making the same, and after deducting therefrom the expenses, hitherto and up to the time of such sale incurred or to be incurred by the trustees in caring for and maintaining said property, including the taxes thereon paid by them, together with a reasonable allowance as compensation to said trustees for their trouble in effecting said sale (if the Court shall see fit to make such allowance in view of the fact that circumstances not contemplated by the testatrix have made a sale of the property necessary, thus entailing trouble and work for the trustees not contemplated by the testatrix), and after deducting therefrom the costs and disbursements of the plaintiffs incurred by them in prosecuting this suit to be taxed as between solicitor and client, and all such costs and disbursements of the other parties to this suit, if any, as the Court may see fit to make a charge upon the fund, be invested and held by said trustees under said will, and their successors, with authority to vary investments from time to time at their discretion, upon the trust to pay over the net annual income

of the fund thus obtained as often as may be convenient to the society known as the Sisters of St. Margaret, to be by the said sisters devoted to the general charitable work of the said sisters ; *provided, however,* that the trustees for the time being administering the trusts declared by the testatrix may invest not more than $6,000 of the proceeds of said sale in the purchase of a house and land on or near the seashore, in this Commonwealth, and hold the same for said sisters, whenever the said trustees are satisfied that with the aid of the income of the remainder of the fund in the hands of the trustees, and such other resources as the sisters may have, said sisters are financially able and willing permanently to establish, maintain and conduct upon the estate so to be purchased, a temporary home for women and girls, in accordance with the directions contained in the will of the testatrix ; and in the event of the establishment of such a home, the income of so much of the fund in the hands of the trustees as shall remain after the purchase of said home, shall no longer be applied by the said sisters to their general charitable work, but shall all be applied by said sisters to the uses and purposes of said home."

Exceptions to the master's report were filed by the heirs at law of the testatrix, and by the Florence Crittenton Home, the Church Home for Orphan and Destitute Children and the Woman's Home Missionary Society of the Methodist Episcopal Church.

At the request of the parties, the case was reserved by *Morton,* J., for the consideration of the full court, upon the pleadings, the interlocutory decree and the appeal therefrom, and upon the master's report and the exceptions thereto, so far as they raised questions of law, the exceptions being overruled so far as they raised questions of fact ; such decree or other disposition of the case to be made as to the full court should seem meet.

*F. R. Bangs,* for the heirs at law of the testatrix.

*J. A. Lowell,* for the Sisters of St. Margaret.

*S. Lincoln,* for the Massachusetts General Hospital, did not care to be heard, and filed a statement to that effect.

*A. R. Weed,* for the Woman's Home Missionary Society of the Methodist Episcopal Church.

*E. B. Gibbs,* for the Florence Crittenton Home.

*F. Cunningham*, for the Church Home for Orphan and Destitute Children, submitted the case on a brief.

*F. T. Hammond*, Assistant Attorney General, for the Commonwealth.

*I. C. Hersey*, for the trustees, the plaintiffs.

HOLMES, C. J.  The first question raised in this case is whether the trust created by the will and codicil is a good charitable trust and has not failed.  It is not disputed that the object declared in the will is a good charity.  Plainly it is.  Then the codicil cancels everything in the will " which limits the charitable uses to which my Real Estate and other property in Braintree shall be put by the beneficiaries," and now directs " that said beneficiaries may use such Estate and the Income of the Trust Fund, for all and any such purposes as shall be approved and sanctioned by the Trustees holding for them."  These words do not mean that the fund may be used for any purpose, whether charitable or not, which the trustees may approve, but only that it may be used for such charitable uses as they approve.  The word " such " refers to " the charitable uses," as further appears from the authority to sell and to use the proceeds for " needs of same charity."  The contrary is not argued for the heirs.

It is argued, however, that the charity has failed.  The ground is that the governing intention is the actual occupation of Seven Oaks, the specific estate devised, as a temporary home, and, subject to that, that it should be occupied by the Sisters of St. Margaret or some other Protestant Episcopalian sisterhood.  There is no doubt that the scheme in the will which has proved impracticable was only second in the mind of the testatrix to her general charitable intent.  But if not accepted by a sisterhood, the whole property is to be conveyed by the trustees of the will to the Trustees of the Massachusetts General Hospital, " to be used for the above-named or similar charitable purposes " ; and this clearly shows that the general charitable intent was not to fail with the failure of the testatrix's scheme so far as the occupation by a sisterhood is concerned.  The words already quoted from the codicil tend to the same conclusion with regard to occupation of the estate, and the perusal of both documents makes it plain that, as might be expected, the creation of a charitable fund is the leading purpose expressed, and is not

subordinate to or conditional upon the keeping up of the estate to which the testatrix seems so attached. *Weeks* v. *Hobson*, 150 Mass. 377, 380. *Sherman* v. *Congregational Home Missionary Society*, 176 Mass. 349, 352. It follows, that the heirs can base no claim upon the master's finding that the purposes of the testatrix cannot be attained in the mode particularly described in the will and codicil, but that those purposes must be carried out, as nearly as may be, by a scheme framed under the sanction of the court.

With some hesitation we are of opinion that the scheme reported by the master should be adopted by the court. It is true that institutions can be found willing to carry out the trust, but they are not within the class mentioned by the testatrix, and the will shows the importance attached to management by a sisterhood, not only by the eleventh paragraph but by the gift to the Massachusetts General Hospital if no Protestant Episcopalian sisterhood would occupy and use the land. The doubt raised by the physician and trustees of the Hospital as to the salubrity of the spot furnishes a reason for not regretting the failure of this part of the testatrix's intent.

If the land cannot be occupied as intended by the testatrix, it is proper that it should be sold. The provision in the will that the trustees shall have no power to sell any part of Seven Oaks hardly would be construed as an attempt to limit the power of the court to authorize a sale, assuming that it is possible to limit it and thus to make specific land inalienable forever. See *Stanley* v. *Colt*, 5 Wall. 119; *Mercer Home, Fisher's Appeal*, 162 Penn. St. 232, 239; *St. Mary Magdalen* v. *Attorney General*, 6 H. L. Cas. 189, 205; *Attorney General* v. *Newark-upon-Trent*, 1 Hare, 395; *In re Clergy Orphan Corporation*, [1894] 3 Ch. 145, 154; Sugden, Law of Property as administered by the House of Lords, 535. But however this may be, the codicil authorizes and directs the trustees to sell any portion of the real estate which cannot be used advantageously; and taking this with the will we are of opinion that a sale may be made.

If a sale is to be made and the use of the place given up, a question might be raised whether the Massachusetts General Hospital is not entitled under the will. The Hospital declined the offer of the trustees, evidently on the assumption that ac-

ceptance would mean an undertaking to use the place; but it would be willing to accept money and to apply the income to its convalescent home for both sexes. We are of opinion that the construction of the will implied in its declining the offer was correct. That is to say, we are of opinion that the gift to the Hospital, although made only in the event of the failure of the desired plan, still adhered to the intent that the specific land should be kept and used. It was not an out and out gift of the property, with no other restriction than that it should be used for charity. Therefore when the occupation of the place, even by the Hospital, fails, the disposition of the proceeds is left untouched by the will except so far as the instrument affords indications of what the testatrix would have been likely to prefer in a case for which she did not provide.

Having money instead of land to deal with, we start again on a new plane, and there seems no sufficient reason why for this new fund we should not follow the order established in the will for the old. It is true that an unscrupulous beneficiary might reject the management of an estate which it was in its power to accept, because it saw a chance to get free money in place of it. But no absolute rule can be founded upon the mere possibility of fraud. The findings of the master establish that this is an honest case. By giving the expenditure of the income to the Sisters of St. Margaret, we give it into the hands which the testatrix preferred, and the scheme contemplates such a home as she wished, although in a different place, whenever the whole fund is sufficient to warrant it.

*Decree accordingly.*