CITY OF BOSTON *vs.* JAMES H. DOYLE & others.

Suffolk.    October 21, 1903. — November 25, 1903.

Present: KNOWLTON, C. J., MORTON, BARKER, HAMMOND, & LORING, JJ.

*Charity.    Boston.    Franklin Fund.    Words,* "Congregational", "Lay out."

The codicil of the will of Benjamin Franklin, proved in 1790, gave to the town of Boston a charitable fund, now held by the city of Boston as trustee, and directed that the fund should be "managed under the direction of the Select Men, united with the Ministers of the oldest Episcopalian, Congregational and Presbyterian Churches in that Town." At the time of the death of the testator there were nine selectmen. *Held,* that the selectmen as managers of the trust did not act as officers of the town, that the aldermen of the city of Boston were not their successors as such managers, and that, the selectmen having ceased to exist, the court sitting in equity would appoint, from the class of citizens indicated by the will, nine lay managers of the trust of whom the mayor of Boston *ex officio* should be one.

Christ Church is the oldest Episcopalian church, the First Church is the oldest Congregational church, and the First United Presbyterian Church is the oldest Presbyterian church, in Boston, within the meaning of the terms of the trust created by the will of Benjamin Franklin proved in 1790, directing that the ministers of the oldest Episcopalian, Congregational, and Presbyterian churches in the town of Boston shall be members of the board of managers of that trust.

The codicil of the will of Benjamin Franklin, proved in 1790, giving one thousand pounds sterling to the town of Boston as a charitable fund, contained the following provision : "If this Plan is executed and succeeds as projected without interruption for one hundred Years, the Sum will then be one hundred and thirty-one thousand Pounds of which I would have the Managers of the Donation to the Town of Boston, then lay out at their discretion one hundred thousand Pounds in Public Works which may be judged of most general utility to the Inhabitants such as Fortifications, Bridges Aqueducts, Public Building, Baths, Pavements or whatever may make living in the Town more convenient to its People and render it more agreeable to strangers, resorting thither for Health or a temporary residence." *Held,* that the words "lay out" in the foregoing provision mean more than the adoption of a plan for the use of the money in the way directed, and include the actual expenditure of it in the establishment of public works of the kind described, all of which is to be done by the board of managers as distinguished from the city of Boston, now holding the legal title of the fund, although the board could not compel the city to assume any burden of maintenance or otherwise involving the use of money to be raised by taxation.

A board of managers of a charitable trust may act by a majority vote.

The provision of R. L. c. 149, § 1, requiring the giving of bonds by trustees appointed by a probate court under a will, is not applicable to the managers of a charitable fund created by will.

BILL IN EQUITY, filed June 11, 1902, by the city of Boston, as trustee of a fund created by a codicil of the will of Benjamin Franklin,* against thirteen aldermen of the city of Boston and three clergymen assuming to act as managers of that fund,† for instructions, upon the following points :

First. Whether the defendant aldermen and clergymen or any of them are managers of that portion of the Franklin fund in the custody and possession of the city treasurer, or have any right, power or authority, and, if so, what right, power or authority in reference to the disposition, management or control of that portion of the fund or any part thereof.

Second. Whether, assuming that the defendant aldermen and clergymen or any of them are the managers of the fund, or in any capacity authorized to dispose of it, the particular purpose or purposes referred to in a certain vote of April 17, 1902, in pursuance of which other votes of May 21, 1902, were passed, are purposes contemplated and permitted by the will and codicil of Benjamin Franklin.

Third. Assuming that the defendant aldermen and clergymen, or some of them, are the managers of the fund, or have some power or authority with reference to the disposition of it, whether such power or authority was not exhausted by certain votes of June 29, 1895, and December 19, 1895, devoting the fund to the erection of a trades school, or by some of the other votes referred to in the bill before the votes of April 17, 1902, and May 21, 1902.

Fourth. What is meant by the following expression in the codicil, to wit, " then lay out at their discretion one hundred thousand Pounds in Public Works which may be judged of most general utility to the Inhabitants such as Fortifications, Bridges, Aqueducts, Public building, Baths, Pavements or whatever may make living in the Town more convenient to its People and render it more agreeable to strangers, resorting thither for Health or a temporary residence," and particularly the words " lay out," and with particular reference to the question whether the person

---

* See *Higginson* v. *Turner*, 171 Mass. 586.

† In *Madden* v. *Boston*, 177 Mass. 350, the court did not find it necessary to pass upon the question whether the persons assuming to act as managers of the Franklin fund lawfully were entitled to act as such managers.

or persons who the court decides are now authorized to lay out the fund have the right to do it in such manner or form or for such purpose as will impose a substantial and continuing expense upon the taxpayers of the city of Boston for the maintenance of the particular object upon which the fund is laid out.

Fifth. Whether, assuming that the defendant aldermen and clergymen, or some of them, are the managers of the fund, or have some power or authority with reference to the disposition of it, these managers can dispose of or lay out the fund by anything less than a unanimous vote.

With an additional prayer, that if the court should deem that the defendant aldermen and clergymen are not the managers of the fund, the court will appoint some suitable person or persons, either private persons or officials of government, as to the court may seem best, to act as managers under the terms of the codicil and to carry out the provisions thereof, and, further, that the respondent James H. Doyle and the other ten defendant aldermen who voted affirmatively on the vote of May 21, 1902, may be enjoined from purchasing the land mentioned in that vote or any other land or doing anything concerning the laying out or expenditure of any part of the Franklin fund until further order of this court, and for further relief.

The votes of May 21, 1902, were as follows: (1) "That James H. Doyle be authorized in behalf of the Managers of the Franklin Fund to purchase on terms stated in the offer of R. E. Townsend, agent, for a sum not exceeding $146,000, 96,000 square feet of land, more or less, situated in Boston, on Washington and Townsend streets, said land having been offered for sale to said managers by said Townsend, and said site having been selected by the vote of said managers, at the meeting of said managers, held May 21, 1902," and (2) " That said Doyle be hereby authorized to make the necessary draft on the City Treasurer for the purchase of said land, according to the terms of said offer." These two votes were passed in pursuance of a vote of April 17, 1902, declaring the purpose of the board of managers or trustees to lay out a portion of the fund to be used for the erection of a building for the promotion of education in the respects mentioned in that vote. On the votes of May 21, 1902, eleven persons voted in the affirmative, to wit, the defend-

ants Doyle, Kelley, Quigley, Lomasney, Bowen, Norris, Dowd, Miller, McCarthy, Farwell and Heath, and four persons voted in the negative, to wit, the defendants Tinkham, Slattery, Duane and MacLennan. The defendant Eells was not present.

The codicil of the will of Benjamin Franklin, dated June 23, 1789, and proved April 23, 1790, contained the following:

" I have considered that among Artisans good Apprentices are most likely to make good Citizens, and having myself been bred to a manual Art Printing, in my native Town, and afterwards assisted to set up my business in Philadelphia by kind loan of Money from two Friends there, which was the foundation of my Fortune, and of all the utility in life that may be ascribed to me, I wish to be useful even after my Death, if possible, in forming and advancing other young men that may be serviceable to their Country in both those Towns.

" To this End I devote Two thousand Pounds Sterling, which I give, one thousand thereof to the Inhabitants of the Town of Boston, in Massachusetts, and the other thousand to the Inhabitants of the City of Philadelphia, in Trust to and for the Uses, Interests and Purposes hereinafter mentioned and declared.

" The said sum of One thousand Pounds Sterling, if accepted by the Inhabitants of the Town of Boston, shall be managed under the direction of the Select Men, united with the Ministers of the oldest Episcopalian, Congregational and Presbyterian Churches in that Town ; who are to let out the same upon Interest at five per cent per Annum to such young married artificers, under the Age of twenty-five years, as have served an Apprenticeship in the said Town ; and faithfully fulfilled the Duties required in their Indentures, so as to obtain a good moral Character from at least two respectable Citizens, who are willing to become their Sureties in a Bond with the Applicants for the Repayment of the Monies so lent with Interest according to the Terms hereinafter prescribed. All which Bonds are to be taken for spanish milled Dollars or the value thereof in current Gold Coin. And the Managers shall keep a bound Book or Books wherein shall be entered the Names of those who shall apply and receive the benefit of this Institution and of their Sureties, together with the Sums lent, the Dates and other necessary and proper Records, respecting the Business and Concerns of this

Institution. And as these Loans are intended to assist young married Artificers in setting up their Business, they are to be proportioned by the discretion of the Managers, so as not to exceed Sixty Pounds Sterling to one Person, nor to be less than Fifteen Pounds. And if the numbers of Appliers so entitled shall be so large, as that the sum will not suffice to afford to each as much as might otherwise not be improper, the proportion to each shall be diminished so as to afford to every one some Assistance. These aids may therefore be small at first; but as the Capital increases by the accumulated Interest, they will be more ample. And in order to serve as many as possible in their Turn, as well as to make the Repayment of the principal borrowed more easy, each Borrower shall be obliged to pay with the yearly Interest, one tenth part of the principal, which Sums of Principal and Interest so paid in, shall be again let out to fresh Borrowers. And as it is presumed that there will always be found in Boston virtuous and benevolent Citizens willing to bestow a part of their Time in doing good to the rising Generation by Superintending and managing this Institution gratis, it is hoped that no part of the Money will at any time lie dead or be diverted to other purposes, but be continually augmenting by the Interest, in which case there may in time be more than the occasions in Boston shall require and then some may be spared to their Neighboring or other Towns in the said State of Massachusetts who may desire to have it, such Towns engaging to pay punctually the Interest and the Portions of the principal annually to the Inhabitants of the Town of Boston.

"If this Plan is executed and succeeds as projected without interruption for one hundred Years, the Sum will then be one hundred and thirty-one thousand Pounds of which I would have the Managers of the Donation to the Town of Boston, then lay out at their discretion one hundred thousand Pounds in Public Works which may be judged of most general utility to the Inhabitants such as Fortifications, Bridges, Aqueducts, Public Building, Baths, Pavements or whatever may make living in the Town more convenient to its People and render it more agreeable to strangers, resorting thither for Health or a temporary residence. The remaining thirty-one thousand Pounds, I would have continued to be let out on Interest in the manner above

directed for another hundred Years, as I hope it will have been found that the Institution has had a good effect on the conduct of Youth, and been of Service to many worthy Characters and useful Citizens. At the end of this second Term, if no unfortunate accident has prevented the operation the sum will be Four Millions and Sixty one thousand Pounds Sterling, of which I leave one Million sixty one Thousand Pounds to the Disposition of the Inhabitants of the Town of Boston and Three Millions to the disposition of the Government of the State, not presuming to carry my views farther.

" All the directions herein given respecting the Disposition and Management of the Donation to the inhabitants of Boston, I would have observed respecting that to the Inhabitants of Philadelphia: only as Philadelphia is incorporated, I request the Corporation of that City to undertake the Management agreeable to the said Directions and I do hereby vest them with full and ample Powers for that purpose ; and having considered that the covering its Grand Plat with Buildings and Pavements, which carry off most of the Rain and prevent its soaking into the Earth and renewing and purefying the Springs, whence the Water of the Wells must gradually grow worse, and in time be unfit for use, as I find has happened in all old Cities, I recommend that at the end of the first hundred Years, if not done before, the Corporation of the City employ apart of the Hundred thousand Pounds in bringing by Pipes the Water of Wissahickon Creek into the Town, so as to supply the Inhabitants which I apprehend may be done without great difficulty, the level of that Creek being much above that of the City and may be made higher, by a Dam, I also recommend making the Schuylkill compleately navigable. At the end of the Second Hundred Years, I would have the disposition of the Four Million and Sixty one thousand Pounds divided between the Inhabitants of the City of Philadelphia and the Government of Pennsylvania, in the same manner as herein directed with respect to that of the Inhabitants of Boston and the Government of Massachusetts.

"It is my desire that this Institution should take place and begin to operate within one year after my decease ; for which purpose due Notice should be publickly given previous to the expiration of that Year, that those for whose Benefit this estab-

lishment is intended may make their respective applications; And I hereby direct my Executors, the survivors or survivor of them, within six Months after my decease, to pay over the said Sum of Two thousand Pounds Sterling, to such Persons as shall be duly appointed by the Select Men of Boston and the Corporation of Philadelphia, to receive and take charge of their respective Sums of One thousand Pounds each, for the Purposes aforesaid.

" Considering the accidents to which all human Affairs and Projects are subject in such a length of Time, I have perhaps too much flattered myself with a vain Fancy, that these Dispositions, if carried into execution, will be continued without interruption, and have the Effects proposed. I hope, however, that if the Inhabitants of the two Cities should not think fit to undertake the execution they will at least accept the offer of these Donations as a Mark of my good-Will, a token of my Gratitude and a Testimony of. my earnest desire to be useful to them even after my departure. I wish indeed that they may both undertake to endeavour the Execution of the Project: because I think that tho' unforseen Difficulties may arise, expedience will be found to remove them, and the Scheme be found practicable: If one of them accepts the Money with the Conditions and the other refuses: my Will then is that both Sums be given to the Inhabitants of the City accepting the whole: to be applied to the same purposes and under the same Regulations directed for the separate Parts: and if both refuse, the Money of course remains in the Mass of my Estate and is to be disposed of therewith according to my Will made the seventeenth day of July 1788."

The allegations of the bill in regard to Christ Church and the First Church in Boston are stated in the opinion. It also was alleged in the bill that the First United Presbyterian Church, of which Mr. MacLennan is the minister, was established in 1847 and was and is the oldest Presbyterian church in Boston, and that from the death of Benjamin Franklin until the establishment of the First United Presbyterian Church there was no Presbyterian church in Boston.

The case came on to be heard before *Loring*, J., who, by agreement of all parties desiring to be heard, reserved it upon

the bill and answers, and the disclaimer of the defendant Gordon, for determination by the full court.

*T. M. Babson*, for the plaintiff.

*N. Matthews, Jr., W. G. Thompson & S. R. Spring*, for the defendant Doyle and others, eleven of the aldermen of the city of Boston.

*A. Boyden, E. C. Bradlee & H. Twombly*, for the defendant Eells.

*F. N. Nash*, Assistant Attorney General, for the Attorney General.

KNOWLTON, C. J. The legacy to the inhabitants of the town of Boston, given in the codicil of the will of Benjamin Franklin, with the provision for the disposition and management of it, constitutes a public charity. It was the intention of the testator that, within a year after his death, benefits should begin to accrue from it to a large class of worthy young men in Boston, through the creation of a fund from which they could borrow on easy terms small sums for their advancement. He provided that at the expiration of one hundred years a large proportion of the accumulated fund should be expended in building or procuring public works of general utility which should promote the convenience and comfort of the people of Boston or of others temporarily abiding there. He provided for the investment and accumulation of the balance for one hundred years more, at the end of which period a part of it is to be subject to the disposition of the people of Boston and a part to the disposition of the government of the State. The plan was stated by the testator with considerable elaboration, and the method of carrying it into effect appears in the codicil. This is by a board of managers to consist of the selectmen of the town, and the ministers of the oldest Episcopalian, Congregational and Presbyterian churches in the town. The gift was in such a form as to raise a question whether the legal title to the fund was in the inhabitants of Boston or in the managers. Similar questions arose in *Drury* v. *Natick*, 10 Allen, 169, and *Cary Library* v. *Bliss*, 151 Mass. 364. In the first of these cases it was held that the legal title was in the town, while the entire management of the property was in a board of trustees provided by the will. In the other case it was said in the opinion that the legal title to the fund was in the

trustees, and that after the library was established the title to the library was in the town ; but in this case, as in *Drury* v. *Natick*, the management of the property both before and after the establishment of the library was in the trustees created by the founder. In regard to the present case it was decided by a majority of this court that the legal title to the fund was in the town of Boston so long as Boston was a town, and is now in the city of Boston. *Higginson* v. *Turner*, 171 Mass. 586. But this decision was not intended to nullify, and could not nullify the provisions of the codicil as to the management of the fund. *Cary Library* v. *Bliss*, 151 Mass. 364. In *Drury* v. *Natick, ubi supra,* where the title to the property was in the town, it was said that the authority given to the trustees was "not a mere naked power, but a power coupled with a trust." In *Cary Library* v. *Bliss* the same was held to be true of the power of the trustees after the establishment of the library as the property of the town.

The provisions in regard to the management of the fund were doubtless deemed important by Dr. Franklin, and they must be given effect, so far as possible, according to his purpose and intention. The following language from the opinion in *Cary Library* v. *Bliss* is applicable to the present case: "That part of the donor's scheme which relates to the management and control of the fund and of the library cannot be disregarded as unimportant. It prescribed the method of administering the charity which she thought best adapted to the accomplishment of her purpose. She chose to give her money to be used in that way. She did not authorize the use of it in any other way, unless for some reason it should become impracticable to pursue the course which she prescribed. It is fair to presume that, before founding this charity, she carefully considered the subject of its administration, and thought it wise to select for her board of trustees those officers who have in their special charge the business interests of the town, and those whose duty it is to superintend the education of children, together with such reverend gentlemen as regularly minister in the churches, and are expected earnestly to desire the moral and religious welfare of all the people." It seems plain, therefore, that the board of managers created by the codicil, acting in a fiduciary relation

under the instrument, are to have the charge and management of the fund, and are to lay out in public works that part of it which is so to be used. See also *Ex parte Blackburne*, 1 J. & W. 297; *Fellows* v. *Miner*, 119 Mass. 541; *Sohier* v. *Burr*, 127 Mass. 221; *Bullard* v. *Chandler*, 149 Mass. 532, 541.

When the town of Boston became a city its board of selectmen went out of existence, and for more than eighty years there has been no such board. At the time of Dr. Franklin's death the selectmen were nine in number, and until the change from a town to a city they constituted a large majority of the managers. This board of managers, as constituted by the testator, ceased to exist in 1822, and only the two clerical members of it remained eligible to continuance in the administration of the trust.

The selectmen while in the performance of their duties as managers were not acting as public officers of the town. They were acting as appointees under the codicil, precisely as the ministers were acting, their only official relation in that field being their relation to the trust. The testator selected his appointees from two classes; and the reference in the will to the public office of the lay members was only a mode of designating the persons appointed to act during their respective terms of office as selectmen. While under the St. 1821, c. 110, the mayor and aldermen became their successors in most particulars as officers of the city, they did not become their successors as managers of the Franklin fund. The will contained no provision in regard to the persons who should act as managers if the office of selectman of Boston should be abolished. But the general purpose of the testator that the fund should be in charge of a board of managers remained unchanged, and in such a case, when it becomes impossible to administer a public charity precisely according to the directions of the founder, it is the duty of a court of equity to carry out his general purpose as nearly as practicable. *American Academy* v. *Harvard College*, 12 Gray, 582. *Weeks* v. *Hobson*, 150 Mass. 377. *Darcy* v. *Kelley*, 153 Mass. 433. *Sears* v. *Chapman*, 158 Mass. 400. *Attorney General* v. *Briggs*, 164 Mass. 561. *Amory* v. *Attorney General*, 179 Mass. 89.

The will being silent as to the persons who are to act as managers with the ministers when there are no longer selectmen,

it is for a court of equity on application, by virtue of its general jurisdiction over the administration of trusts, to appoint other managers. Without such an appointment no one is legally authorized to act in the place of the selectmen.

For many years the mayor and aldermen, and more lately the aldermen alone, acted as managers with the ministers without objection. It seems that until lately no controversies have arisen, nor any important differences of opinion as to the conduct of the business. It is only since the expiration of the first hundred years, when it is time to lay out money in public works, that it becomes important to look sharply at the legal rights of the persons assuming to act as managers.

From what we have already said it appears that, in the absence of any appointment by a court, no person succeeded to the powers and rights of the selectmen in the execution of this trust. Long acquiescence by the clerical managers and others, in the action of members of the board of aldermen, does not give members of that board a right to act in the disposition of this fund. It follows that the votes of May 21, 1902, passed by the affirmative action of eleven persons, all of whom were members of the board of aldermen, against the negative vote of two ministers, members of the board of managers, and two persons who were members of the board of aldermen, were without legal authority and void.

We are asked for instructions upon the question whether the defendants Mr. Eells, Mr. Duane, and Mr. MacLennan, are authorized to act as managers under the codicil. Upon the facts stated this question should be answered in the affirmative as to each of them. The persons designated in this part of the will are " the Ministers of the oldest Episcopalian, Congregational and Presbyterian Churches in that Town." This means three ministers in all, representing the three denominations mentioned, each one representing the oldest church of his denomination in Boston. There seems to be little if any real dispute upon this part of the case. Upon the facts stated we are of opinion that King's Chapel ceased to be an Episcopalian church within the meaning of the term used by the testator, and that Christ Church is the oldest Episcopalian church in Boston. The Reverend Doctor George A. Gordon, pastor of the Old South Congrega-

tional Church, averring that he was made a defendant against his will, declares that the church of which he is pastor is not the oldest Congregational church in Boston within the meaning of the words in the codicil, and disclaims any rights·or interest in these proceedings, and in the matter to which they relate. The bill states that at the time of Dr. Franklin's death the church of which Mr. Eells is the pastor was the oldest Congregational church in Boston. It further states that the minister, and probably a majority of the members of this church, then entertained opinions about the doctrine of the Trinity and other matters of dogma which were substantially the same as the opinions which later became known under the distinctive name of Unitarian, in contradistinction to Congregational, or Orthodox Congregational. It is stated that the line of demarcation between these two branches of the Congregational church was distinctly drawn about the year 1815. Both branches of the church have continued Congregational in government since that date, and many, if not most of the churches in whose name the word "Congregational" appears, even if Unitarian in doctrine, have retained their name unchanged. The leading American lexicographers make the primary meaning of the word "Congregational" pertain to church government, although a secondary and popular meaning relates to doctrine. Doubtless many of the ministers and people of so-called Orthodox Congregational churches entertain doctrinal opinions very different from those most prevalent in the same churches one hundred years ago. We are of opinion that the testator, in using this word, did not have in mind any nice shades of distinction in regard to the doctrine of the Trinity, or other kindred doctrines, but that he meant to include churches of a kind well known in Boston and elsewhere in Massachusetts, which were not exactly alike in their doctrines, but which, chiefly by reason of their polity, were called Congregational. The case does not show that the so-called "First Church in Boston" has ceased to be a Congregational church within the meaning of the will.

The Supreme Court of New Hampshire in *The Dublin case*, 38 N. H. 459, gave an elaborate decision which fully covers the question before us, and which is in accordance with the view we have stated. Decisions in this Commonwealth recognize the

distinguishing features of Congregational churches. *Baker* v. *Fales*, 16 Mass. 488, 515. *Weld* v. *May*, 9 Cush. 181, 184. *Attorney General* v. *Federal Street Meeting-house*, 3 Gray, 1, 57.

The words " lay out" mean something more than the adoption of a plan for the use of the money in the way directed. They include the actual expenditure of it in the establishment of public works of the kind described, all of which is to be done by the board of managers.

It hardly could be contended that this board could compel the city of Boston to assume any burden of maintenance or otherwise, involving the use of money to be raised by taxation, whatever the city might do voluntarily under the authority of law. In view of our decision in regard to the invalidity of the votes, we do not deem it necessary to consider questions as to the details of the particular expenditure to which the votes relate.

The duties of the managers are not of a kind which require a unanimous vote of the board as a foundation for action. The concurrence of a majority is sufficient to authorize proper proceedings. This board is similar to a board of public officers, or a committee appointed by a public body to perform public duties. Such a board or committee may always act by a majority. *Damon* v. *Granby*, 2 Pick. 345. *Williams* v. *Lunenburg School District*, 21 Pick. 75. *Weymouth & Braintree Fire District* v. *County Commissioners*, 108 Mass. 142. It is a board appointed to act in a fiduciary capacity in the administration of the affairs of a public charity. A distinction is made between private agents, or agents or trustees of a private trust, and trustees managing business of a public charity like that intrusted to this board. In the performance of duties of this latter kind, a board may act by a majority. *Morville* v. *Fowle*, 144 Mass. 109, 113. *Ward* v. *Hipwell*, 3 Giff. 547. *The King* v. *Beeston*, 3 T. R. 592. *Withnell* v. *Gartham*, 6 T. R. 388.

The final prayer of the bill for special relief is, that if the court takes the view of the law which we have taken, it will appoint some suitable person or persons to act as managers under the terms of the codicil, and will enjoin the defendant Doyle and the other ten defendant aldermen who acted affirmatively in the votes of May 21, 1902, from purchasing the land mentioned

in the vote, and from doing anything concerning the laying out or expenditure of any part of the Franklin fund.

We are of opinion that this prayer should be granted. Before appointing managers to act in the place of the selectmen, it is necessary to ascertain as nearly as possible the general purpose of the testator in selecting his board. Looking at the designation of persons who were to constitute from time to time the lay members of the board, and also at the designation of clerical members, it seems that they were chosen, not for any particular official qualification, or for the possession of any particular doctrinal opinions, but with a view to their representative character, as men together combining the best general qualifications for the administration of such a trust. When the codicil was made the three religious denominations mentioned in it were leading denominations in this part of the United States, and the ministers in charge of leading churches of these denominations held a high place for influence in the community, not only in religious affairs, but in educational, charitable and social matters. Boston was a town of a very small population in comparison with the present population of the city, and the nine persons chosen for selectmen would naturally represent a considerable proportion of the intelligence, integrity, strength and business ability of the town at that time. In a city of the size of Boston to-day, such a board necessarily includes only a comparatively small proportional part of the whole number of able and excellent men who would be willing to serve without pay in charitable work. If there were any peculiar duties pertaining to the official station of the selectmen which were considered by the testator as indicating fitness for service as managers, doubtless they were the important executive and administrative duties performed by these town officers. By the original city charter of Boston (St. 1821, c. 110) these duties were imposed upon the mayor and aldermen, and by the amendatory statute of 1854, c. 448, most of them were left to be performed by the board of aldermen alone, of which the mayor was no longer to be a member. By the later statute of 1885, c. 266, § 6, the Legislature took from the board of aldermen all its executive power and conferred it upon the mayor, and by § 12 forbade action by the board in any administrative or executive business

of the city, putting all this power into the hands of the mayor and certain boards in charge of special departments. So far as the exercise of executive and administrative functions by the selectmen was evidence of their qualifications and a reason for their appointment as managers of this charity, the reason is not applicable to the aldermen of Boston under existing laws. The mayor is the official representative of executive power in the city, and if the performance of executive duties in the city government should be considered in the selection of the managers of this charity, he is the only officer of distinction in this department. In regard to the administration of the charity the testator said in the codicil, "It is presumed that there will always be found in Boston virtuous and benevolent Citizens willing to bestow a part of their Time in doing good to the rising Generation by Superintending and managing this Institution gratis," etc. We are of opinion that managers should be appointed by the court from this class of citizens, chosen by reason of their qualifications, intellectual and moral, for this important service. We deem it proper that the mayor *ex officio* should be a member of the board, and that the whole number of lay members to act with the clerical members should be the same as the number of selectmen at the time of Dr. Franklin's death.

The provisions of the R. L. c. 149, § 1, in relation to the giving of bond by trustees appointed by the Probate Court under a will, are not applicable to these managers. *Drury* v. *Natick*, 10 Allen, 169, 176. *Lowell, appellant*, 22 Pick. 215. The case is to be heard before a single justice of this court, for the appointment of nine managers, of whom the mayor of the city shall be one, to act with the ministers in accordance with this opinion, and an injunction is to be issued as prayed for.

*So ordered.*